Filed 7/10/13  On transfer from Supreme Court

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C060135 |
| Plaintiff and Respondent, | (Super. Ct. No. SF105311A) |
| v. | |
| JOSEPH WEBER, | OPINION ON TRANSFER |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Bernard J. Garber and Richard Vlavianos, Judges.  Affirmed.

J. Edward Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown Jr., Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Judy Kaida, Deputy Attorneys General, for Plaintiff and Respondent.

1

BY THE COURT:

A jury convicted defendant Joseph Weber of unlawful possession of a gun and of ammunition. (Pen. Code, §§ 12021, subd. (c)(1), 12316, subd. (b)(1).) The jury acquitted him of violating a court order and making criminal threats. (Pen. Code, §§ 273.6, 422.) The trial court sentenced defendant to prison for three years, and defendant timely filed his notice of appeal.

On appeal, defendant principally contends the trial court failed to conduct an adequate *Faretta*[1] inquiry, to ensure that defendant was competent to waive the assistance of counsel, actually wanted to waive counsel, and knowingly and voluntarily waived counsel. The record shows that the trial court attempted to provide standard *Faretta* admonitions on the record, but defendant repeatedly interrupted with frivolous objections to the proceedings, as he did throughout the case. We conclude defendant was trying to inject reversible error into the case by insisting on his right to proceed without counsel, but thwarting the trial court's ability to complete standard *Faretta* admonitions. Further, the trial court did ascertain on the record that defendant understood he would be held to the same standards as an attorney, that the trial court would not assist him in representing himself, and that another trial judge had recently allowed defendant to represent himself in a criminal case. In these circumstances, we conclude the record supports the trial court's finding that defendant knowingly and voluntarily chose to waive counsel.

Defendant also contends that the trial court improperly failed to appoint counsel to represent him at the sentencing hearing, and improperly imposed the upper state prison term. We conclude that these contentions, too, lack merit.

---

[1] *Faretta v. United States* (1975) 422 U.S. 806 [45 L.Ed.2d 562].

Finally, under *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*), defendant is not entitled to further presentence custody credit. We affirm the judgment.[2]

## FACTS AT TRIAL

Daniel Smith testified he married defendant's former wife, and on August 6, 2006, he obtained a restraining order against defendant. Despite this order, defendant repeatedly drove behind Smith's car and repeatedly parked near Smith's workplace, where defendant made rude and threatening gestures, and at one point, while gesturing to an emblem on his back as he sat astride a motorcycle, defendant told Smith, " 'We're going to kick your fucking ass.' "

Documents showed defendant was convicted of spousal battery (Pen. Code, § 243, subd. (e)) on July 5, 2000. This conviction prohibited him from possessing firearms or ammunition for 10 years. (Pen. Code, §§ 12021, subd. (c)(1), 12316, subd. (b)(1).) The jury was so instructed.[3]

Defendant's former wife in part testified that defendant had previously held a knife to her throat.

San Joaquin County Deputy Sheriff Edward Casseday testified that on May 10, 2007, he arrested defendant inside defendant's Stockton house. Deputy Casseday saw a "very old looking revolver" on a table or bookcase in the bedroom and he seized it. Deputy Nelida Stone testified that she and Deputy Matuska searched defendant and found

---

[2] This case was initially filed on June 7, 2010, and modified on June 23, 2010, in a published decision authored by former Associate Justice Rick Sims. Our Supreme Court granted review on August 18, 2010, and transferred the case back to this court on May 15, 2013, with directions to reconsider the case in light of *Brown*. Associate Justice Elena J. Duarte was selected to replace Justice Sims, who retired in the interim. The panel adopts Justice Sims's opinion largely verbatim, except as to part IV.

[3] The jury was also instructed, per CALCRIM No. 2510, that "[a] firearm does not need to be in working order if it was designed to shoot and appears capable of shooting."

a live round of ammunition in his pants pocket. When Deputy Casseday was recalled, defendant objected to the flag in the courtroom. Deputy Casseday then testified the round was a 7.63 millimeter Mauser round, and it could not be fired from the revolver he had seized. Although Deputy Casseday testified there was also a "live round" in the revolver, the unlawful ammunition count was based on the round discovered in defendant's pocket.

Deputy Carlos Prieto testified that he is the range master and armorer for the San Joaquin County Sheriff's Department, and he has previously testified as a firearms expert. He testified the revolver was a replica of a Western-style cap and ball revolver, and although it had some rust on the finish, it was capable of firing ammunition.

After the People rested, defendant called Betty Ellen Perkins, his mother, and asked her questions designed to show that Smith had lied about defendant's purported violation of court orders and threats due to a custody battle involving defendant's son. She testified the revolver had belonged to defendant's father and when she had last seen it, it was "a rusted old piece of junk." She also testified defendant had served in the U.S. Marine Corps. She identified cigar cutters that had been fashioned from bullets, presumably by defendant, who described such activity in his opening statement.

In the middle of his mother's testimony, after she was prevented from giving her opinion about the significance of the flag, defendant clarified that it was the *yellow fringe* on the flag that he objected to, because in his view such flags are inappropriate except in military courtrooms. The trial court (Garber, J.) replied, "Well, you were in the Marines, and I was in the Army," and that the yellow fringe on the bottom of the flag probably reflected nothing more than the county had bought the cheapest possible flags.

Defendant called Richard Gallegos, who testified there were no charges pending against defendant as a flesh and blood human being, and when the trial court cut off irrelevant questioning, defendant accused the judge of being biased. Eventually, Gallegos testified he had served as an armorer while in the military in Vietnam, and in his

4

opinion the revolver could not be determined to be a firearm unless it was fired, and he did not think the revolver was the same "firearm" he had seen in defendant's house: "It's very similar to the one that I saw [but] the one that I saw was in [worse] condition than this by far." The gun he saw in defendant's house was not operable because the hammer could not be pulled back and the cylinder would not rotate, but those defects were not present on the revolver he examined in court.

Another defense witness testified defendant had asked him to make cigar cutters out of firearm rounds. The prosecutor elicited that this witness was a "Nomad," a branch of the Hell's Angels.

Defendant testified in a narrative fashion. He admitted the object identified as a revolver was found in his house and the ammunition was in his pocket. He testified the gun was "a memento" but he did not believe it was a firearm because it was not operable. He admitted his former wife, that is, Smith's current wife, was the victim in his prior battery case. He knew he was not supposed to possess a firearm or ammunition.

The jury convicted defendant of unlawful possession of a firearm and ammunition, but acquitted him of charges that he threatened Smith and violated a court order.

DISCUSSION

I. *Faretta* Waiver

Defendant contends the record does not show he knowingly and voluntarily waived counsel. Defendant contends he was not competent to waive counsel, he never actually wanted to waive counsel, and the trial court did not conduct an adequate inquiry to ensure he knew the risks of self-representation. We disagree with these contentions.

A. Procedural Background

The complaint was filed on July 30, 2007. Defendant was represented by attorney Douglas Srulowitz through the March 11, 2008, arraignment on the information.

On April 28, 2008, Srulowitz asked to be relieved, and the public defender was appointed to represent defendant. When the trial court (Garber, J.) said that he did not

5

understand defendant's paperwork, defendant replied: "Well, then, sir, I would suggest you get a competent attorney to discuss it with you." After more discussion, the trial court declared a doubt about defendant's competency, (Pen. Code, § 1368) appointed the public defender to represent him, and appointed two psychiatrists to evaluate him.

Both psychiatrists reported that defendant was malingering.

Dr. Gary Cavanaugh's report states defendant "was alert and partially cooperative but intense, very contentious, suspicious, and bombastic. He was evasive at times[.]" Defendant was of normal intelligence, but "he appeared focused on patriots and his constitutional rights" and there was some evidence of "paranoid ideation." "Mr. Weber's intent appears to be to thwart and prevent his prosecution" by using techniques "filed by or championed by organizations that challenge the legitimacy of the court or the United States government." Defendant had a personality disorder, with "Defiant, Narcissistic, and Paranoid Traits[,]" but was "aware of the charges, knows the roles of the legal protagonists, understands that he is involved in an adversarial process, and knows possible outcomes."

Dr. Robert Hart's report states defendant was "cautious, articulate, and exceptionally legalistic." Defendant's intelligence was normal and his "specious, quasi-legal arguments" reflected "intellectual hubris as opposed to mental illness." Defendant probably had a narcissistic personality disorder, but he was "able to know and understand the charges against him and could assist counsel in presenting a rational defense, if he chose to do so[.]"

On June 12, 2008, the attorneys submitted the matter, and Judge Vlavianos found defendant was competent.

By letter dated July 3, 2008, the public defender advised defendant of an upcoming court date. Defendant wrote a rambling and paranoid letter in reply. In part the letter challenged the public defender's right to communicate with defendant and threatened to have any attorneys who tried to represent him arrested unless they presented

6

their "bar card/certificate of admission and their attorneys [*sic*] license with their oath endorsed on the back[.]"

On July 16, 2008, defendant again appeared before Judge Vlavianos. The public defender stated defendant did not want "public defender representation." When Judge Vlavianos noted that Judge Agbayani had found defendant competent to "represent" himself in a separate case, defendant interjected, "I'm going to defend myself. To represent myself is the wrong term to use."

Although Judge Vlavianos explained that he had to make a record to support a finding that defendant was competent to represent himself, defendant refused to fill out a *Faretta* waiver form, refused to answer questions about his competency to waive counsel, objected to the flag on display in the courtroom, and moved to dismiss the case "on the basis of a speedy trial." Judge Vlavianos told defendant he had to file a written dismissal motion, relieved the public defender, stated that because defendant had been found competent to waive counsel in the other case, he could do so in this case, and asked defendant to look at the *Faretta* waiver form.

After a break, defendant asked: "Your Honor, is the Court trying to force me to waive my rights to privacy and the right to defend myself against my will and over my objections?" When Judge Vlavianos began to explain, defendant interrupted as follows: "THE COURT: You have the – you have your constitutional right to -- [¶] THE DEFENDANT: That's not what I asked you, sir. I asked you if you are trying to force me to give up those rights."

Possibly in response to a question on the *Faretta* form, defendant said he could not be held to the standards of an attorney.[4] Judge Vlavianos replied: "You are held to exactly the same standard as an attorney and you will get no breaks and no special

---

[4] The form is not in the record.

7

treatment because you're representing yourself. You will be held to exactly the same standard as an attorney, which means if you want to file a motion you have to notice the other side, you have to do it in the appropriate amount of time, you have to try it with points and authorities, and you have to give the legal basis for it."

When Judge Vlavianos asked if defendant understood, defendant said: "Well, I got documentation that shows the Court to notice that I'm not supposed to but that's what you say. Yeah, I can handle it. [¶] THE COURT: What is it that you see the role of a pro per defending himself? [¶] THE DEFENDANT: I'm going to defend myself." Judge Vlavianos repeatedly asked what defendant's role would be at trial, and defendant repeatedly replied with variations on "I have the proper documentation and everything I need to defend myself, and that's all I have to say."

When Judge Vlavianos asked how defendant would get witnesses, defendant said that if he needed them, "I'll bring them in. That's all I have to say. THE COURT: How would you get the witnesses into court? [¶] THE DEFENDANT: Advice of counsel, I wish to remain silent. [¶] THE COURT: I understand that. Do you have any idea how you would get the witnesses to come into court? [¶] . . . [¶] THE DEFENDANT: My advice as counsel, I don't want to answer any more questions, sir."

Eventually, after defendant again said he did not want to answer questions, the following took place:

> "THE COURT: Do you understand that you would have to follow through the same rules that an attorney would follow to be able to procure witnesses, and if you were not aware of those rules and because of that the witnesses were not available, that you may lose a case you might otherwise win?
>
> "You understand that?
>
> "THE DEFENDANT: Yes.
>
> "THE COURT: Okay. All right. I'm going to go ahead, Mr. Weber, and find Judge Agbayani found you competent to represent yourself in pro per at the

8

last trial. I think you are capable. It's a constitutional right. I think you're capable. It may or may not be a wise choice, but I think you're capable and competent of doing that. So public defender's office has been relieved. I'll make the finding that you can represent yourself in pro per.

"THE DEFENDANT: Once again, I refuse to use the word represent --

"THE COURT: I think it's also very important for the record to indicate that previously there were 1368 proceedings and in those proceedings [defendant] was found competent. So I think you're competent to waive or give up your right to have an attorney, and you're competent to exercise your constitutional right to represent yourself."

After defendant said he would file a counterclaim, and the prosecutor stated she was "not comfortable" that an adequate *Faretta* waiver was made, Judge Vlavianos partly stated: "The only [real] standard of competence for *Faretta* purposes is that he is competent to understand the proceedings. It's the same standard as 1368. He was found competent under 1368. I think he understands the [role] of attorney. So he does have the constitutional right to represent himself."

That day, July 16, 2008, defendant filed his counterclaim, as well as motions objecting to the flag and to the prosecutor's status, requiring prosecution witnesses to post bonds, and other frivolous matters. Some of these documents were signed "Joseph, surname Weber/Sui Juris."

At a hearing on July 23, 2008, defendant objected to the flag in the courtroom and "to not being charged with my true and correct name," and moved to dismiss the action.

The next day, defendant filed an objection to "fraudulent" court minutes, and claimed to reject the "offer" to represent "the noticed artificial person JOSEPH WEBER. Furthermore, I, supra, do not '*Consent*' to this proceeding." He signed this document "Joseph, Weber/Sui Juris." Also on July 24, 2008, defendant filed a list of "live flesh and blood men" who were to be his witnesses.

On July 28, 2008, defendant challenged the credentials of the prosecutor, objected to the flag, and moved to dismiss for delay. When Judge Garber asked if defendant was

9

willing to admit to the prior battery conviction, defendant first said: "That's fine. I spit in her face. She attacked me, and I spit in her face." But then he refused to admit the conviction, stating, "I object to all of this." Defendant stated he had four available witnesses, and had not shown the People his evidence. He moved to dismiss because Smith was "lying through his teeth . . . and he's now back on to drugs." He reiterated prior motions and objections, which were denied or overruled.

On July 29, 2008, the jury trial began before Judge Garber. At various times at the trial, defendant made frivolous objections to the flag in the courtroom, the power of the court, the authority of the prosecutor, and so forth. As stated above, defendant was acquitted of the counts involving threatening Smith and violating the restraining order, but convicted of unlawfully possessing a firearm and ammunition.

### B. Contentions on Appeal and Analysis

Defendant contends that he lacked competence to waive counsel, he never actually wanted to waive counsel, and the trial court failed to conduct an adequate inquiry to insure his waiver was knowing and voluntary. We disagree.

#### 1. Competency to Waive Counsel

In related claims, defendant contends that he was not competent to waive counsel. In part he points to the frivolous objections he made throughout the proceedings to show that there was a serious question about his mental state. He also contends the trial court applied the wrong standard to determine competency. He also contends the trial degenerated into a "spectacle." We conclude Judge Vlavianos properly found defendant competent to waive counsel, and disagree that the trial proceedings before Judge Garber became a spectacle or showed that defendant was, in fact, incompetent to proceed without counsel.

Judge Vlavianos correctly stated that the same standard of competency used at the competency hearing applied to the competency to waive counsel. The competency defendant needed was the competency to *waive the right* to counsel, and to determine

10

this, a trial court applies the same standard that it uses to determine if a defendant is competent to stand trial. (*Godinez v. Moran* (1993) 509 U.S. 389, 399-401 [125 L.Ed.2d 321, 332-333] (*Godinez*).) The question is whether the defendant "has 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and has 'a rational as well as factual understanding of the proceedings against him.' " (*Godinez*, *supra*, 509 U.S. at pp. 391, 396 [125 L.Ed.2d at pp. 327, 330], quoting *Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 825] (*Dusky*); see *People v. Welch* (1999) 20 Cal.4th 701, 732 (*Welch*).)

The evidence at the competency hearing indicates that defendant's bizarre motions and objections were not the result of delusions, but were intentional efforts to thwart the proceedings. Both of the psychiatrists who examined defendant concluded he was malingering. The fact he continued to make frivolous objections and motions does not mean that his mental condition deteriorated after the competency finding, it simply shows that defendant persisted in his efforts to thwart the proceedings. And, "once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry." (*People v. Marks* (2003) 31 Cal.4th 197, 220.)

Defendant relies on a United States Supreme Court case, *Indiana v. Edwards* (2008) 554 U.S. 164 [171 L.Ed.2d 345] (*Edwards*). He contends that *Edwards* established a different standard for evaluating competency to waive counsel. He also contends that *Edwards* mandates considerations of the "dignity" of the proceedings, and argues the proceedings following the *Faretta* hearing were farcical, and "made a spectacle of the trial." We disagree.

*Edwards* involved a "gray area" defendant, that is, a defendant who "falls in a gray area between *Dusky's* minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for another legal purpose." (*Edwards*, *supra*, 554 U.S. at p. 172 [171 L.Ed.2d at p. 354].) *Edwards* held that "the Constitution permits judges to take realistic account of the

11

particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards*, *supra*, 554 U.S. at pp. 177-178 [171 L.Ed.2d at p. 357].)

*Edwards* distinguished *Godinez* in part because *Godinez* held a state could *permit* a "gray area" defendant to represent himself; *Edwards* did not directly hold that a state must *deny* a gray-area defendant self-representation. (*Edwards*, *supra*, 554 U.S. at pp. 173-174 [171 L.Ed.2d at p. 355].)

In *People v. Taylor* (2009) 47 Cal.4th 850 (*Taylor*), the California Supreme Court held that *Edwards* does not compel a state to adopt a different standard of competency for self-representation than the standard of competency used to determine if a defendant may stand trial while represented by counsel. After reviewing the development of California and federal rules regarding competency, *Taylor* concluded:

"The court in *Edwards* did not hold, contra to *Godinez*, that due process mandates a higher standard of mental competence for self-representation than for trial with counsel. The *Edwards* court held only that states *may*, without running afoul of *Faretta*, impose a higher standard, a result at which *Godinez* had hinted by its reference to possibly 'more elaborate' state standards. (*Godinez*, *supra*, 509 U.S. at p. 402.) 'In light of *Edwards*, it is clear . . . that we are free to adopt for mentally ill or mentally incapacitated defendants who wish to represent themselves at trial a competency standard that differs from the standard for determining whether such a defendant is competent to stand trial. It is equally clear, however, that *Edwards* does not *mandate* the application of such a dual standard of competency for mentally ill defendants. In other words, *Edwards* did not alter the principle that the federal constitution is not violated when a trial court permits a mentally ill defendant to represent himself at trial, even if he lacks the mental capacity to

12

conduct the trial proceedings himself, if he is competent to stand trial and his waiver of counsel is voluntary, knowing and intelligent.' (*State v. Connor* (Conn. 2009) 973 A.2d 627, 650.) *Edwards* thus does not support a claim of federal constitutional error in a case like the present one, in which defendant's request to represent himself was granted." (*Taylor*, *supra*, 47 Cal.4th at pp. 877-878.)

The California Supreme Court also rejected the claim that a trial court should have exercised discretion to apply a different standard "because, at the time of defendant's trial, state law provided the trial court with no test of mental competence to apply other than the *Dusky* standard of competence to stand trial (see *Dusky v. United States*, *supra*, 362 U.S. 402), under which defendant had already been found competent." (*Taylor*, *supra*, 47 Cal.4th at p. 879.)

Here, as in *Taylor*, the trial court *permitted* defendant to represent himself, and did so by applying the correct legal standard. "In that circumstance, the court did not err in relying on federal and state case law equating competence for self-representation with competence to stand trial." (*Taylor*, *supra*, 47 Cal.4th at p. 867.)[5]

Furthermore, the psychiatric evaluations in the record show that defendant does not suffer from any mental illness, that is, he is not a "gray area" defendant as that term was used in *Edwards*. The diagnoses merely showed that he had or probably had a

---

[5] In *United States v. Ferguson* (9th Cir. 2009) 560 F.3d 1060, the Ninth Circuit Court of Appeals read *Edwards* broadly to mean that there *is* a different standard of competency for waiving counsel than for standing trial. (*Id*. at pp. 1067-1070 & fn. 4.) However, "we are bound by our high court's interpretation of federal law." (*People v. Landry* (1996) 49 Cal.App.4th 785, 791; see *People v. Madrid* (1992) 7 Cal.App.4th 1888, 1895.)

Defendant also relies on *People v. Burnett* (1987) 188 Cal.App.3d 1314, to support the proposition that there is a different standard of competency for self-representation. The California Supreme Court concluded that *Burnett* "did not articulate a separate California competence standard and, after *Godinez*, was not good law as to the federal standard." *(Taylor, supra*, 47 Cal.4th at p. 881.) Therefore, *Burnett* does not support defendant's contention.

narcissistic personality disorder. Defendant does not argue that equates to a mental illness.

In this connection, appellate counsel asserts that defendant thought he was in a military courtroom but the trial court, Judge Garber, improperly disregarded his delusions. We disagree. Defendant's objections about the fringe on the flag and other frivolous points were designed to derail the proceedings, they did not show that defendant actually believed he was being court-martialed.

*Edwards* in part observed that "a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel" and "the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling." (*Edwards*, *supra*, 554 U.S. at p. 176 [171 L.Ed.2d at pp. 356-357].) Appellate counsel contends defendant's dignity was impugned and the trial became a "spectacle," as contemplated by *Edwards*, and he accuses Judge Garber of poking fun at defendant.

Assuming that this passage of *Edwards* has application in a case, such as this one, not involving a mentally ill defendant, we reject defendant's contention.

Defendant's dignity was not impugned, it was honored by the order granting his *Faretta* request: "Respect for the dignity and autonomy of the individual is a value universally celebrated in free societies and uniformly repressed in totalitarian and authoritarian societies. Out of fidelity to that value defendant's choice [to waive counsel] must be honored even if he opts foolishly to go to hell in a handbasket. At least, if the worst happens, he can descend to the netherworld with his head held high. It's called, 'Doing It My Way.' " (*People v. Nauton* (1994) 29 Cal.App.4th 976, 981 see *People v. Truman* (1992) 6 Cal.App.4th 1816, 1825.)

Instead, it was defendant's frivolous objections and motions that impaired the dignity of the proceedings. Defendant made an opening statement, cross-examined witnesses, objected to evidence and made a closing statement. Although he did not

14

perform with the skill of an attorney, that is not required, and the trial was not turned into a "spectacle." In this connection, recall that the record shows the jury took the case seriously, as evidenced by its acquittals on two counts.

Appellate counsel points to three comments to support his claim that the court "could not avoid making fun of [defendant] in front of the jury." In fairness to Judge Garber, who exercised exemplary patience with defendant throughout the trial, we address each of these points separately.

During jury selection, after Judge Garber told the prospective jurors the nature of the charges and mentioned that defendant was "representing" himself, defendant objected and stated he took "offense" to that term and stated he was "going to defend myself," not "represent myself, sir." Judge Garber told the prospective jurors about hardships, "to see if anyone is unable to serve as a -- I need to talk you out of it before we get into it. Not yet. I've never seen so many people so eager to get out of here." We do not read this passage as a slap at defendant or at his decision to defend himself, as does appellate counsel. The transcript suggests that one or more prospective jurors raised their hands in the middle of the judge's statement about hardships. Jury selection can be protracted and difficult, and judges commonly inject some levity into such proceedings.

Appellate counsel cites a second instance that he states took place in the middle of trial, but he provides no record citation for this comment, therefore the point is forfeited. (See *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16**.**) In any event, as described by appellate counsel, defendant stated he was confused, and Judge Garber replied, " 'I know you are.' " On a cold transcript we do not know the tone with which this comment was delivered, and, in any event, it is not the sort of comment that would transform a trial into a spectacle.

Finally, appellate counsel points to a passage during defendant's cross-examination of Deputy Prieto, the People's firearms expert. Defendant asked if the deputy had a "performance bond," and the following took place:

15

"THE COURT:  Do you have a performance bond?  Do you have it?

"[Defendant]:  Do you have a performance bond?

"THE COURT:  Do you have it in your hand?

"THE WITNESS:  No.

"[Defendant]:  Funny.  I find no humor in that, sir.

"THE COURT:  I do.  What does that have to do with anything?  Of course he doesn't have a performance bond."

Defendant then explained he wanted show the law required the deputy to have a bond.  The passage does not reveal the tone and possible gestures that took place, but even assuming Judge Garber teased some humor out of an absurd line of inquiry, that did not convert the trial into a spectacle.

Accordingly, we reject defendant's contention that Judge Vlavianos applied the wrong standard to determine his competency to waive counsel, and we reject his subsidiary contentions that Judge Garber allowed or caused the trial to become a spectacle because of defendant's mental incompetence.

2.  Desire to Waive Counsel

Defendant contends he did not want to represent himself.  We disagree with this contention.

At the outset of the *Faretta* hearing, the public defender in part stated: "[Defendant] has made it abundantly clear to me that he does not want representation. He, specifically, does not want public defender representation."  After the public defender mentioned defendant's options of hiring counsel or proceeding without counsel, Judge Vlavianos observed that Judge Agbayani had found defendant competent to represent himself.  At this point, defendant interrupted:

"THE DEFENDANT:  Excuse me.  I take offense to you saying represent myself.

16

"THE COURT:  I hear you.

"THE DEFENDANT:  I'm going to defend myself.  To represent myself is the wrong term to use."

After Judge Vlavianos asked defendant to review the *Faretta* waiver form, defendant asked whether the court was "trying to force me to waive my rights to privacy and the right to defend myself against my will and over my objections?"  Thus, he showed his understanding that he had a right to "defend" himself, which he proceeded to exercise.

Defendant points to the rule that "[c]ourts must indulge every reasonable inference against waiver of the right to counsel."  (*People v. Marshall* (1997) 15 Cal.4th 1, 20.)  Defendant contends that the trial court should have conducted a *Marsden*[6] hearing to explore the adequacy of the public defender's representation, but instead "incorrectly suggested to [defendant] that proceeding in pro per was his only remaining option" and defendant, "perhaps in uninformed resignation, told the court that he was going to defend himself."

This is not a plausible reading of the record.  As we have indicated, defendant bristled at various points when reference was made to defendant *representing* himself, as he drew some distinction between *representing* himself and *defending* himself.  But other than that quibble, defendant stated clearly that he wanted to proceed without an attorney.  Nothing at the *Faretta* hearing, or at trial, indicates defendant's desire to proceed without counsel had anything to do with the quality of services provided by the public defender.  Accordingly, the trial court properly treated defendant's request as a *Faretta* motion, not a *Marsden* motion.

---

[6]  *People v. Marsden* (1970) 2 Cal.3d 118.

### 3. Knowing and Voluntary Waiver

Defendant contends Judge Vlavianos did not complete the standard *Faretta* admonishments, and therefore he did not *knowingly* waive counsel. We agree the standard *Faretta* admonishments were not completed, but disagree with the conclusion that defendant did not knowingly waive counsel. We conclude he acted with knowledge of the basic risks of self-representation and chose to accept them.

In addition to finding a defendant competent, a trial court must ensure that the defendant realizes " 'the probable risks and consequences of self-representation[.]' " (*People v. Nauton*, *supra*, 29 Cal.App.4th at p. 979.) Generally, a defendant should be told that "self-representation is almost always unwise and that the defense he conducts might be to his detriment; he will have to follow the same rules that govern attorneys; the prosecution will be represented by experienced, professional counsel who will have a significant advantage over him in terms of skill, training, education, experience, and ability; the court may terminate his right to represent himself if he engages in disruptive conduct; and he will lose the right to appeal his case on the grounds of ineffective assistance of counsel. [Citation.] In addition, he should also be told he will receive no help or special treatment from the court and that he does not have a right to standby, advisory, or co-counsel." (*People v. Phillips* (2006) 135 Cal.App.4th 422, 428.)

There are standard scripts for judges to use in taking *Faretta* waivers, as well as standard *Faretta* waiver forms. (See *People v. Blair* (2005) 36 Cal.4th 686, 708-709 (*Blair*); Cal. Judges Benchguide: Right to Counsel Issues (CJER 2010) §§ 54.37-54.38, pp. 54-40 to 54-48 (*Right to Counsel Issues*).)

However, although there are standard scripts and although courts have emphasized the importance of thoroughly admonishing a defendant before accepting a *Faretta* waiver, there is no required form of waiver: "The requirements for a valid waiver of the right to counsel are (1) a determination that the accused is competent to waive the right, i.e., he or she has the mental capacity to understand the nature and object of the

18

proceedings against him or her; and (2) a finding that the waiver is knowing and voluntary, i.e., the accused understands the significance and consequences of the decision and makes it without coercion." (*People v. Lawley* (2002) 27 Cal.4th 102, 139.) "No particular form of words, however, is required in admonishing a defendant who seeks to forgo the right to counsel and engage in self-representation. ' "The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." ' " (*Id*. at p. 140.)

"Thus, '[a]s long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form of warning is required.' [Citations.] [¶] On appeal, we independently examine the entire record to determine whether the defendant knowingly and intelligently waived the right to counsel." (*People v. Burgener* (2009) 46 Cal.4th 231, 240-241 (*Burgener*); see *People v. Doolin* (2009) 45 Cal.4th 390, 453; *People v. Bloom* (1989) 48 Cal.3d 1194, 1224-1225.)

The failure to give a particular set of advisements does not, of itself, show that a *Faretta* waiver was inadequate. Instead, "[t]he burden is on appellant to demonstrate that he did not intelligently and knowingly waive his right to counsel. . . . [T]his burden is not satisfied by simply pointing out that certain advisements were not given." (*People v. Truman, supra,* 6 Cal.App.4th at p. 1824; see *People v. Sullivan* (2007) 151 Cal.App.4th 524, 547 (*Sullivan*); *People v. Mellor* (1984) 161 Cal.App.3d 32, 37.) Instead, the purpose of standardized advisements is prophylactic, "to ensure a clear record of a knowing and voluntary waiver of counsel, not to create a threshold of competency to waive counsel." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1071.)

Although no particular warnings are required, "before a defendant may be allowed to proceed pro se, he must be warned specifically of the hazards ahead." (*Iowa v. Tovar* (2004) 541 U.S. 77, 88-89 [158 L.Ed.2d 209, 220].) "If the trial court's warnings

19

communicate powerfully to the defendant the 'disadvantages of proceeding pro se,' that is all '*Faretta* requires.' [Citation.] Our waiver inquiry 'must be pragmatic,' and focused upon 'the status of the defendant's knowledge and understanding at the time of the purported waiver.' [Citation.] 'The requirement is met if the record establishes the defendant is literate and understanding and has voluntarily exercised the choice of representing himself.' [Citation.] The 'information a defendant must have to waive counsel intelligently will "depend, in each case, upon the particular facts and circumstances surrounding that case" [citation].' " (*Sullivan*, *supra*, 151 Cal.App.4th at p. 546.)

Defendant contends the court did not advise him of "the 'possible pitfalls' or 'consequences' of self-representation." (*Burgener*, *supra*, 46 Cal.4th at p. 241.) Although defendant interrupted repeatedly, and refused to answer or gave hostile answers to standard questions posed by Judge Vlavianos, defendant stated on the record that he understood he would be held to the same standards as an attorney, and that because of his lack of legal training he could lose a case he might otherwise have won. In our view, those two points adequately brought home to defendant the essential dangers of self-representation. Further, Judge Vlavianos placed on the record the additional fact that defendant had recently been granted his *Faretta* rights in another case. In our view, the record "'suggests no confusion on defendant's part' regarding the 'risks of self-representation, or the complexities of his case, much less that his election to represent himself was other than voluntary.'" (*Sullivan*, *supra*, 151 Cal.App.4th at p. 553.)

Whenever Judge Vlavianos tried to give defendant *more* information about the risks of self-representation, defendant refused to listen, apparently because of his personal views about the legal system. That does not mean defendant did not understand the essential risks of self-representation.

Defendant states the trial court "inexplicably" relied on the fact that Judge Agbayani had granted his *Faretta* motion in another recent case. This tended to show

defendant knew the risks of self-representation and knowingly and voluntarily waived counsel. (*Sullivan*, *supra*, 151 Cal.App.4th at pp. 552-553; *People v. Jackson* (1978) 88 Cal.App.3d 490, 497 ["Defendant's understanding of his right to counsel and his decision to represent himself were further demonstrated by the fact that he had represented himself in a prior criminal proceeding"], disapproved on another point by *People v. Barnum* (2003) 29 Cal.4th 1210; *Right to Counsel Issues*, *supra*, § 54.37, p. 54-41 [*Faretta* form asks about previous self-representation]; see also *Blair*, *supra*, 36 Cal.4th at pp. 703, 704, 707, 709 [noting Blair's prior self-representation].)

In part, defendant suggests that his behavior after the *Faretta* hearing shows he lacked an understanding of the risks of self-representation, or should have caused the trial court to terminate his right to self-representation. A trial court may revoke self-representation if the defendant engages in disruptive or obstructionist behavior. (See *People v. Carson* (2005) 35 Cal.4th 1, 8-12; *Welch*, *supra*, 20 Cal.4th at pp. 734-735.) But a trial court is not *compelled* to revoke self-representation in such cases. "The trial court possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' [Citations.]" (*Welch*, *supra*, 20 Cal.4th at p. 735.) The fact a defendant does a bad job, or even fails to contest the case, is not a basis to revoke self-representation. (See *People v. Carson*, *supra*, 35 Cal.4th at p. 8 [quoting *Faretta*, " 'whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain' " about the quality of his defense]; *People v. Parento* (1991) 235 Cal.App.3d 1378, 1381-1382 [self-represented defendant refused to participate at trial, no error].) Further, although defendant made many frivolous objections, the record does not show that he was out of control, engaged in behavior that impaired the orderly progress of the trial, or did anything to justify terminating self-representation. Indeed, the two acquittals show that defendant did a reasonably good job.

21

Thus, we conclude that neither the trial court's inability to complete the standard *Faretta* admonishments, nor defendant's subsequent behavior, shows that defendant did not understand what he was doing when he waived the right to counsel. Instead, the record shows he wanted to waive counsel, understood the essential risks of doing so, and chose to do so.

Judge Vlavianos did all that reasonably could be expected, faced with a defendant who insists on representing himself, but thwarts efforts to complete standard *Faretta* admonishments. Judge Vlavianos did not err by honoring defendant's choice to waive counsel, and Judge Garber did not err by failing to revoke defendant's right to proceed without counsel.

## II. Counsel at Sentencing

In two related contentions, defendant contends Judge Garber's failure to appoint counsel at sentencing was prejudicial error, requiring a new sentencing hearing. He couches this as a federal error, relying on *Robinson v. Ignacio* (9th Cir. 2004) 360 F.3d 1044, and as an abuse of discretion under state law, relying on cases such as *People v. Ngaue* (1991) 229 Cal.App.3d 1115. However, in those cases, there were explicit requests for counsel at sentencing. (*Robinson v. Ignacio*, *supra*, 360 F.3d at p. 1048; *People v. Ngaue*, *supra*, 229 Cal.App.3d at pp. 1122-1123.) We reject defendant's contention because he made no unequivocal request for counsel in this case.

At the beginning of the sentencing hearing, defendant asked for a "JAG" or Judge Advocate General, and again referenced the flag in the courtroom. Later during the hearing, he stated the trial court had not allowed him to have his "counsel" present, referring to "Richard Gallegos, my uncle[.]" Richard Gallegos had appeared with defendant during one of the competency evaluations, and testified at trial as defendant's firearms expert. Defendant had asked that his uncle be allowed to assist him at the counsel table during trial, and defendant had also told the probation officer that his uncle

22

was doing legal research for him. The trial court proceeded with the sentencing hearing without appointing counsel for defendant.

A request to revoke in propria persona status and have an attorney appointed is committed to the sound discretion of the trial court. (*People v. Lawrence* (2009) 46 Cal.4th 186, 192.) However, such a request must be unequivocal, just as a request to waive counsel must be unequivocal. (*Id*. at p. 193.)

As stated in a case involving the converse situation of a request to waive counsel, "*Faretta* motions must be both timely and unequivocal. Otherwise, defendants could plant reversible error in the record. [Citations.] Equivocation of the right of self-representation may occur where the defendant tries to manipulate the proceedings by switching between requests for counsel and for self-representation, or where such actions are the product of whim or frustration." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1002.)

Defendant did not make an unequivocal request for counsel, and it was evident that he had been trying to manipulate the proceedings from the beginning. His request for a "JAG" at sentencing was a further iteration of his frivolous contention that the yellow fringe on the flag meant that he was being tried in a military courtroom. His request that his "uncle" who was not an attorney be allowed to represent him was also frivolous.

Defendant argues that even if he was equivocal as to *who* he wanted to help him at sentencing, he articulated that he wanted *someone* to help him. We disagree. The sentencing transcript shows he never asked for an attorney. As shown by his abilities during the trial -- in which he obtained acquittals on two counts -- and by the competency reports, defendant had the knowledge and ability to say, "I want an attorney to help me now" if that was what he wanted.

We conclude that because defendant did not make an unequivocal request for counsel, the trial court did not err by proceeding with the sentencing hearing.

23

### III. Upper-Term Sentencing

Defendant contends the trial court improperly imposed an upper-term sentence. He contends the trial court relied on facts not found true by the jury, and also that the trial court abused its discretion by relying on improper facts.

At the beginning of the preliminary hearing, the prosecutor had offered defendant misdemeanor probation if he admitted either the firearm or ammunition count, but defendant rejected that offer. After the trial, the People filed a memorandum stating that, although a midterm sentence of two years was justified, the People would be satisfied with the lower term of 16 months in state prison.

The probation officer recommended probation, in part noting defendant's honorable military service.

Defendant made a nearly eight-page statement at sentencing, most of which consisted of irrelevant points similar to the ones raised throughout the proceedings, attacks on the trial court judge, and defiance of the proceedings. However, he also referred to his good military service.

The trial court denied probation because defendant would not comply with any judgment of the court, therefore there was no basis to grant probation. The trial court imposed the upper term of three years for possession of a firearm, and a concurrent midterm of two years for possession of ammunition. The trial court stated as follows:

> "So looking at the facts of this case, I've heard the trial. The defendant was arrested and convicted of a driving under the influence of alcohol [(DUI)] while this case was pending. There is continuing animosity between the defendant, the victim, and the witness in this case. We have a firearm involved.
>
> "THE DEFENDANT: No, there is not.
>
> "THE COURT: A dangerous situation. There is absolutely no remorse whatsoever.
>
> "So, for Count 4, possession of a firearm --

24

"THE DEFENDANT:  It's not true, sir.

"THE COURT:  -- I feel that the appropriate term is the upper term of three years state prison.

"For the possession of ammunition, in Count 3, I think that the appropriate term is the [midterm] of two years state prison.  That will run concurrently with Count 4."

Defendant contends the trial court improperly imposed the upper term based on facts not found true by the jury, in violation of his Sixth Amendment rights as articulated in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856] and related cases. We reject this claim.  Defendant committed his crimes and was sentenced after March 30, 2007, when the Determinate Sentencing Law was amended to eliminate the presumption that the middle term should be imposed, therefore the sentence did not violate defendant's federal constitutional rights.  (See *People v. Wilson* (2008) 164 Cal.App.4th 988, 991-992.)

The California Supreme Court has described a trial court's discretion under current law as follows:  "Even with the broad discretion afforded a trial court under the amended sentencing scheme, its sentencing decision will be subject to review for abuse of discretion.  [Citations.]  The trial court's sentencing discretion must be exercised in a manner that is not arbitrary and capricious, that is consistent with the letter and spirit of the law, and that is based upon an 'individualized consideration of the offense, the offender, and the public interest.'  [Citation.]  As under the former scheme, a trial court will abuse its discretion under the amended scheme if it relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decision."  (*People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*).)  "[A] trial court is free to base an upper term sentence upon any aggravating circumstance that the court deems significant, subject to specific prohibitions.  [Citations.]  The court's discretion to

25

identify aggravating circumstances is otherwise limited only by the requirement that they be 'reasonably related to the decision being made.' " (*Id*. at p. 848.)

Defendant acknowledges the trial court's broad discretion to select a determinate sentence, post-*Sandoval*, but contends the trial court abused its discretion in this case. He parses the trial court's ruling finely and argues the trial court could not rely on the firearm, because that was an element of the offense, could not rely on the DUI conviction because it occurred after he committed these offenses, and could not rely on the lack of remorse because he contested guilt.

Assuming for purposes of argument that we accepted defendant's attacks on the three specific reasons described above, the trial court relied on a fourth reason that adequately supports the upper term: The threat posed by defendant's continuing animosity towards Smith and his former wife.[7]

---

[7] The People do not argue the possession of a firearm can be used to aggravate the sentence for unlawful possession of a firearm. (See Cal. Rules of Court, rule 4.420(d).)

Lack of remorse can be used to aggravate a sentence " 'unless the defendant has denied guilt *and* the evidence of guilt is conflicting.' " (*People v. Leung* (1992) 5 Cal.App.4th 482, 507.) Defendant admitted possessing the ammunition, but he received a stayed midterm sentence for that offense. He contested whether the revolver fit the legal definition of a revolver. The jury was instructed it had to be "designed to shoot and appear capable of shooting." Defendant's evidence, including testimony by his mother and uncle, was to the effect that the gun was "a rusted old piece of junk[,]" and, inferentially, did not appear capable of shooting. Thus, it appears the evidence was in conflict on this point and lack of remorse was not an appropriate aggravating factor.

The probation report states defendant was on probation at the time of these offenses. It also states the DUI occurred on February 23, 2008, and defendant was convicted of the DUI on July 3, 2008, shortly before the beginning of trial in this case. The Attorney General argues that DUI conviction shows poor performance on probation, although it occurred after the instant offenses. Appellate counsel states defendant was not on probation, because the probation report also states he was placed on probation for three years on September 2, 2001, therefore his probation was over before the instant crimes and the DUI were committed. As a general rule, factual objections to probation reports must be made in the trial court to preserve them for appeal. (See *People v. Bartell* (2009) 170 Cal.App.4th 1258, 1262; *People v. Evans* (1983) 141 Cal.App.3d 1019, 1021.)

26

A single aggravating factor will support an upper-term sentence. (*People v. Osband* (1996) 13 Cal.4th 622, 728, 732.)

In addition to the enumerated aggravating circumstances, a trial court may base its sentencing decision on "additional criteria reasonably related to the decision being made. Any such additional criteria must be stated on the record by the sentencing judge." (Cal. Rules of Court, rule 4.408(a); see *People v. Black* (2007) 41 Cal.4th 799, 817.) Contrary to defendant's view, the trial court may consider a fact as aggravating even though the jury acquitted the defendant of charges based on that fact, and the fact need only be proven by a preponderance of the evidence. (*People v. Towne* (2008) 44 Cal.4th 63, 83-89.)

Therefore, the trial court could consider the evidence of defendant's violations of the restraining order and threat to hurt Smith in concluding, "There is continuing animosity between the defendant, the victim, and the witness in this case" which created a "dangerous situation."

The record supports the trial court's implicit view that defendant had no intention of abiding by societal norms. He displayed contempt for legal authority throughout these legal proceedings. He knew he could not possess ammunition, but ignored that prohibition. The jury rejected his claim that the revolver he concededly possessed was a rusted memento. Despite the acquittals, the trial court could conclude defendant repeatedly violated the restraining order and threatened Smith. Based on defendant's persistent flouting of the law, the trial court could rationally conclude the restraining order would not protect Smith and defendant's former wife, and therefore an upper-term sentence was appropriate.

---

However, because we find another aggravating factor, we need not resolve this apparent conflict in the record.

27

The trial court's decision was "not arbitrary and capricious," was "consistent with the letter and spirit of the law," and was "based upon an 'individualized consideration of the offense, the offender, and the public interest.' " (*Sandoval*, *supra*, 41 Cal.4th at p. 847.) Therefore, we cannot say the trial court abused its discretion.

Contrary to defendant's view, the fact the trial court imposed a sentence higher than had been sought by the People, before and after trial, does not show an abuse of discretion. The pretrial offer was not accepted and therefore was irrelevant, and although the People's posttrial recommendation was relevant to the sentencing determination, it did not limit the trial court's discretion.

## IV.  Custody Credits

In our original opinion we deemed defendant to have raised the issue whether amendments to Penal Code section 4019, effective January 25, 2010, applied retroactively to entitle him to additional presentence credits. They do not. (*Brown*, *supra*, 54 Cal.4th 314.)

## DISPOSITION

The judgment is affirmed.


THE COURT:


      RAYE          , P. J.



      NICHOLSON   , J.



      DUARTE      , J.