Filed 8/11/21  P. v. Sankikian CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MAGGIE S. SANKIKIAN,<br><br>Defendant and Appellant. | B308441<br><br>(Los Angeles County<br>Super. Ct. No. BA442828) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund Willcox Clarke, Jr., Judge.  Affirmed as modified.

Janet Uson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

This case has returned to us following a remand to the trial court to exercise its discretion whether to strike a five-year prior that had been imposed on Maggie S. Sankikian. On remand and at the resentencing hearing, the trial court made statements and referred to matters that Sankikian now argues were not in evidence and demonstrated the trial judge's bias. Sankikian therefore contends in this latest appeal that her sentence must again be vacated and the matter remanded for another sentencing hearing. We disagree. Therefore, although we modify the judgment to correct credits, we otherwise affirm the judgment.

## BACKGROUND

As we detailed in our prior opinion, *People v. Sankikian* (June 20, 2019, B282229) [nonpub. opn.], Sankikian was an admitted member of the Mara Salvatrucha gang (MS-13) known as Goofy. After being found in an apartment with marijuana, methamphetamine, and drug paraphernalia, she was arrested and tried for possessing marijuana and methamphetamine for sale. At her trial, evidence of Sankikian's prior drug-related arrests and wiretapped phone calls between Sankikian and MS-13 gang members was admitted. Those phone calls included conversations Sankikian had with two MS-13 gang members, one a shot caller and another a foot soldier or enforcer. In those calls, she asked for drugs to sell and referred to a man who was "crossing a fucking line" and was "going to turn into a rat." Sankikian said the man was a problem that needed to be "fixed."

A jury found Sankikian guilty of possessing methamphetamine for sale (Health & Saf. Code, § 11378; count 1) and of possessing marijuana for sale (*id.*, § 11359; count 2) and

found true a gang allegation (Pen. Code,[1] § 186.22, subd. (b)(1)(A)). In 2017, the trial court, after denying Sankikian's *Romero*[2] motion, sentenced her on count 1 to two years doubled to four years based on the prior strike, three years for the gang enhancement, five years for a prior serious felony (§ 667, subd. (a)), and two 3-year terms for prior drug convictions (Health & Saf. Code, § 11370.2, subd. (a)). Her total prison term was therefore 18 years.

Sankikian appealed the judgment, raising claims of instructional and evidentiary errors. We rejected those claims but remanded for resentencing so that the trial court could consider whether to strike the five-year prior under then recently-enacted Senate Bill No. 1393. (*People v. Sankikian*, *supra*, B282229.) We also directed the trial court to strike the two 3-year terms imposed under Health and Safety Code section 11370.2.

On August 27, 2020, the trial court resentenced Sankikian. After commenting at length on MS-13 and Sankikian, which comments we detail *post*, the trial court denied Sankikian's renewed *Romero* motion and declined to strike the five-year prior. The trial court sentenced Sankikian on count 1 to the upper term of three years doubled to six years due to the prior strike, five years for the prior serious felony, and the upper term of four years for the gang enhancement. The trial court imposed a concurrent term on count 2. Her total prison term therefore was 15 years.

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

## DISCUSSION

I.     Sentencing issues

Sankikian makes two arguments about her sentence.  First, the trial court abused its discretion by failing to consider her individual circumstances and relying on facts outside the record.  Second, the trial court's bias violated Sankikian's due process rights.  After setting forth the relevant additional facts, we address, and reject, each argument.

A. *Additional facts regarding the resentencing hearing*

At the resentencing hearing, the prosecutor advocated a sentence of 16 years four months, which included a consecutive sentence on count 2.  However, the trial court noted that it had not originally imposed a consecutive sentence on count 2 and was not inclined to do so now.  Rather, the trial court said it knew what it was doing when it had made that choice at the original sentencing hearing, just as it knew what it was doing when it had said Sankikian associated with high-level people in MS-13, a gang the trial court described as "murderous" and "destructive" and would "be better off removed from the face of the earth by some means."

The trial court then described a letter Sankikian wrote in support of resentencing in which she failed to acknowledge "what horrible people she has helped in the past.  [¶]  When I say murderers and people that are subversive to our society, that's not hyperbole.  That's actual fact.  [¶]  I saw her picture in the paper among MS members rounded up by the federal government.  So let's not kid ourselves.  She's not some court [*sic*] bobbing on the seas of society.  She's part of a major evil criminal enterprise, at least was in the past, and as far as I know, she

4

hasn't disowned it or helped anyone disassemble it and she may still be down with them. And that's her choice, but at sentencing I don't see what she's going to say that would make a difference. [¶] Now, if you think she's got something to say that will make a difference, I will hear from her."

When defense counsel asked to argue and to have her client speak, the trial court said they could, but it had telegraphed its thinking, so counsel should not hope that what they said would "have traction with me." Sankikian spoke and said she realized what she had done was wrong, but her childhood and that she was "in domestic" led her "to do what I did." She regretted a lot of the things she had done and would not go back to her old behaviors when she got out of prison. She had family support, would go into sober living, had a job, would relocate out of Los Angeles, and was getting her G.E.D. and having her tattoos removed.

The trial court thanked Sankikian for her statement but told her that it had presided over another trial in which two MS-13 gang members smirked at the brother of the man they had killed. "So MS-13 is not a joke. It's not something that's caused from being raised by parents who are economically deprived or underserved by the community. It's an organized international gang that does evil and kills people. And for anybody to fund that and participate in it and not realize that they're doing something horribly wrong, to me, is inconceivable. [¶] So this is not a sentence that based on Ms. Sankikian's substance use issues or her desire to rehabilitate, whether drugs that she sold affected her life. [¶] When she pledged herself to the goals of that gang, she gets to share with them accountability of the gang. So that affects the sentence in a way that is so profound that all

the rehabilitation and all the speech making and nobilities in prison are unlikely to erase it. And I noticed in that statement she didn't say one thing negative about that group." The trial court recognized that Sankikian could suffer consequences if she said something negative about the gang, but that's what happens "when you associate with evil criminal like [*sic*]; that is, you expose yourself to accountability."

When defense counsel argued that her client got involved with the gang at a young age without realizing what she was getting herself into, and the gang became a second family to her, the trial court rhetorically asked if it had joined ISIS as a second family, would that absolve it from "the murdering" ISIS supports or does? At some point, the trial court asked, "don't we have to notice what we're doing and hold ourselves accountable?" The trial court went on to note that Sankikian had been involved with a group "doing evil," and she was on the phone with shot callers. So, she was not just "some young woman who fell on hard times. [¶] No. She's a gangster. She's a major criminal. She could be Al Capone if you had the right time frame. [¶] So why should I give sympathy and mercy to someone like that?"

Responding, defense counsel pointed out that the people Sankikian had been arrested with in a federal case were charged with murder-related crimes, whereas this case involved possession for sale with a gang enhancement. So, this case did not involve injuries or "physical victims." Also, Sankikian was now older, had been availing herself of services in prison, and was trying to distance herself from the gang.

The trial court countered that the more "powerful demographical is she's a woman, and I can't tell you how . . . few women I've seen who have risen to these heights in a gang. I

could count them on one hand.  [¶]  I've seen plenty of men who are stupid enough to join gangs and do the stupid things they do, but the number of women who join and rise to her level, very rare.  She so broke the glass [ceiling] in that regard and she stands out to me because of it, but it's not in a favorable way."

Defense counsel then asked the trial court to consider "the facts of this crime itself, the circumstances under which it occurred."   The trial court said it was considering the facts of the case, including that the people Sankikian talked to in the wiretapped calls were prosecuted for murder and that they had discussed murdering a person who was working for them.  Thus, the more the trial court considered the case, the less it helped Sankikian.

Still, defense counsel asked the trial court to strike the five-year prior, because Sankikian was an older defendant (39 years old) and did not have the same stature as men in the gang but instead was a minor drug dealer.  The trial court, however, found that Sankikian's familiarity with MS-13 gang members showed she was a powerful person in the hierarchy, "which was a bad choice, and she is going to spend time in prison because of that bad choice.  [¶]  But you will not persuade me that she was just some local dime bag seller who happened to know the phone numbers of all these powerful men that ran this criminal entity, and there are wire taps that prove it."

The trial court accordingly denied the *Romero* motion, declined to exercise its discretion to strike the five-year prior, and imposed the upper terms on count 1 and the gang enhancement. In selecting the upper term, the trial court referred to the "seriousness of the conduct overall, the criminal history of the

7

defendant, [and] the collateral information about her conduct relative to the gang."

B. *The trial court did not abuse its discretion.*

Sankikian contends that the trial court abused its discretion by refusing to strike the five-year prior and imposing the upper terms on count 1 and the gang enhancement because it did not fashion an individualized sentence and relied on facts outside the record. We disagree.

A trial court has broad discretion in its sentencing choices. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.) This discretion includes choosing between the upper, middle, and low terms and weighing aggravating and mitigating circumstances. (§ 1170, subd. (b); *People v. Lai* (2006) 138 Cal.App.4th 1227, 1258; Cal. Rules of Court, rule 4.420(b).) A single aggravating factor will support an upper term sentence, subject to the requirement the aggravating factor be reasonably related to the decision. (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1064.) Similarly, in deciding whether to strike a five-year prior, a trial court should evaluate all relevant circumstances to ensure the punishment fits the offense and the offender. (*People v. Shaw* (2020) 56 Cal.App.5th 582, 587.)[3]

We review a trial court's sentencing choices for an abuse of discretion and reverse only if there is a clear showing the choice was arbitrary or irrational. (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 847.) A court abuses its discretion if it relies on

---

[3] *Shaw*, at pages 585 to 586, noted that few published cases have defined the scope of a trial court's authority to strike a prior serious felony enhancement in the furtherance of justice under section 1385 but concluded that it was at least clear that such authority is reviewed for an abuse of discretion.

circumstances that are irrelevant to the decision or that otherwise constitute an improper basis for decision. (*Ibid*.) The burden is on the party attacking the sentence to clearly show the trial court's decision was irrational or arbitrary. (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116.)

Sankikian's contention that the trial court abused its discretion in its sentencing choices relies primarily on its reference to matters outside the record:  a photograph of Sankikian being arrested with other gang members, that two gang members smirked at a victim's brother in another trial this judge presided over, and Sankikian was a high-ranking MS-13 gang member.  We agree that at least the photograph and what happened in another trial were not in evidence.  Even so, that the trial court *referred* to these matters does not mean that the trial court *relied* on them improperly in making its sentencing choices.

Rather, where a trial judge's statements as a whole disclose a correct concept of the law and its application, secondary remarks will not be deemed to have impeached the judge's determination.  (*People v. Lichens* (1963) 59 Cal.2d 587; *People v. Cartier* (1960) 54 Cal.2d 300, 313.)  In *Lichens*, for example, the trial judge, in denying probation, referred to matters outside the record.  The appellate court, in finding no abuse of discretion, observed that trial judges often read newspapers, hear radio reports, and receive other information relative to a cause they are hearing but are capable of disregarding such irrelevant evidence. (*Lichens*, at p. 588.)  Therefore, the trial judge's allusion to "matters of knowledge outside the record concerning defendant's pattern of conduct was merely a brief introduction to his clear statement that his order to deny probation was based upon a weighing" of matters in the record.  (*Id.* at p. 589.)

9

This is true here, too. The totality of the record shows that the critical aggravating factor driving the trial court's sentencing decisions was Sankikian's MS-13 gang membership. Aside from any matter outside the record, this fact was undisputed and well-established. Sankikian admitted she was an MS-13 gang member; Sankikian had access to a high ranking MS-13 gang member; and Sankikian used her access to request that a problem with a potential snitch be taken care of. Thus, not only did Sankikian sell drugs for MS-13, but she also used its violent resources to do so.

This evidence also supported the other aggravating factor the trial court cited, albeit in not so many words, that Sankikian occupied a position of leadership or dominance in committing the crime. (See, e.g., Cal. Rules of Court, rule 4.421(a)(4).) While the record does not establish that Sankikian was a high-ranking MS-13 gang member on par with Al Capone, neither does it establish that she was a mere lackey. She had access to leaders in the gang and called an MS-13 shot caller with national influence. In those calls, she asked for drugs and that a "problem" with a man be taken care of. This evidence therefore supports the trial court's finding that she was not just a minor drug dealer.

In addition to this, the trial court cited Sankikian's criminal record as an aggravating factor to justify imposing the upper terms. (See, e.g., Cal. Rules of Court, rule 4.421(b)(2) [prior convictions are numerous or of increasing seriousness].) That criminal record included a 2005 attempted robbery, convictions in 2006 and 2011 for transporting or selling controlled substances, and convictions in 2015 for possessing a controlled substance and for carrying a concealed dirk or dagger. This criminal background, coupled with the substantial and troubling

10

evidence surrounding Sankikian's MS-13 membership and willingness to use the gang's violent tactics, shows the increasingly serious nature of her crimes.

We therefore conclude that the totality of the record shows that the trial court's sentencing decision was not arbitrary and capricious and was based on an individualized consideration of the offense, the offender, and the public interest.  (See, e.g., *People v. Sandoval*, *supra*, 41 Cal.4th at p. 847.)  No abuse of discretion occurred.

C.    *Judicial bias*

Just as we cannot find that the trial court abused its discretion, we cannot agree with Sankikian's related contention, that the trial court's comments evidenced bias and a lack of impartiality so as to constitute a deprivation of her due process rights.[4]

The constitutional right to due process "requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of the case."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1111, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)  A party claiming bias has a high hurdle to overcome, as the facts must objectively establish bias.  (*People v. Chatman* (2006) 38 Cal.4th 344, 363.)  Although actual bias is not required for judicial disqualification under the due process clause, the mere appearance of bias is also not sufficient.  (*People v. Freeman*

---

[4] Although Sankikian did not object to the alleged judicial misconduct and has therefore forfeited the issue on appeal (see, e.g., *People v. Seumanu* (2015) 61 Cal.4th 1293, 1320), we nonetheless address the merits of the issue.

11

(2010) 47 Cal.4th 993, 996.) "Instead, based on an objective assessment of the circumstances in the particular case, there must exist ' "the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable." ' " (*Ibid.*) A due process violation will be found only in the exceptional case presenting extreme facts. (*Id.* at p. 1005.)

We assess whether any proven misconduct or bias was so prejudicial as to deprive the defendant of a fair trial. (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1112.) Even if the trial judge's conduct " 'left something to be desired,' " we still must determine whether that conduct was so prejudicial as to deny the defendant a fair, as opposed to a perfect, trial. (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

Even were we to agree that the trial judge's comments here left something to be desired, we would not find either that the trial judge was actually biased against Sankikian or that Sankikian was deprived of a fair trial. Rather, the totality of the record shows that the trial judge's concededly exacting and harsh comments flowed from his familiarity with MS-13 both generally and based on the evidence in this case and not from actual bias against Sankikian. The trial court clearly based its sentencing choices on Sankikian's intimate involvement with high ranking MS-13 gang members and willingness to use that relationship to sell drugs.

II.    Custody credits

At Sankikian's original sentencing hearing, the trial court awarded her 402 days of actual custody credits and 402 days of conduct credit. At the resentencing hearing, the trial court awarded her 1,675 actual days of custody credit *and* 1,674 conduct credits. However, as the People point out and Sankikian

concedes, Sankikian was not entitled to additional conduct credit. That is, a convicted felon once sentenced and committed is not restored to presentence status for the purposes of sentence-credit statutes by virtue of a limited remand. (§ 4019, subd. (a); *People v. Buckhalter* (2001) 26 Cal.4th 20, 23.) Any credits earned beyond actual custody time are under any worktime system. (*Buckhalter*, at p. 23.) The abstract of judgment must therefore be modified to reflect that Sankikian had 2,077 days of custody credit (1,675 actual days plus 402 days of conduct credit).

## DISPOSITION

The trial court is directed to modify the abstract of judgment to reflect 2,077 days of custody credit and to forward the modified abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed as modified.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

13