Filed 8/28/14  P. v. Broussard CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B248544 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA125873) |
| v. | |
| DARRICK BROUSSARD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John Cheroske and Laura R. Walton, Judges.  Reversed in part, modified in part, and affirmed with directions.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Supervising Deputy Attorney General, and Tasha G. Timbadia, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Darrick Broussard appeals from the judgment entered following a jury trial in which he was convicted of assault with a deadly weapon, with findings he personally used a deadly weapon and inflicted great bodily injury resulting in coma.

Defendant, who represented himself throughout the proceedings pursuant to *Faretta v. California* (1975) 422 U.S. 806, 821 [95 S.Ct. 2525] (*Faretta*), contends his waiver of the right to counsel was not knowing and intelligent because the trial court failed to sufficiently advise him of the of the dangers and disadvantages of self-representation and ascertain whether his waiver was knowing and intelligent. We disagree. A review of the entire record demonstrates the knowing, intelligent, and voluntary character of defendant's waiver of counsel.

Defendant also contends the trial court failed to instruct upon an element of the great bodily injury resulting in coma enhancement in violation of due process. We agree and reduce the enhancement to reflect the two-year great bodily injury enhancement upon which the court instructed.

Defendant further contends the trial court erred by excluding him from an in camera review of prior convictions of the victim and prosecution witnesses and by imposing restitution and parole revocation fines in the minimum amount for crimes committed on or after January 1, 2013, whereas his crime was committed in 2012. We conclude defendant forfeited these appellate contentions by failing to object in the trial court.

## BACKGROUND

**1.**     **Prior incidents between defendant and victim**

Beginning sometime after Thanksgiving in 2011, defendant on several occasions approached, or looked for, Efraim Burgos at the residence he shared with Dorothy Sharp. Burgos, Sharp, and Sharp's niece, Carolyn Jones, testified about these incidents, in which defendant accused Burgos of slashing the tires on defendant's car and threatened to kill Burgos. Burgos denied slashing defendant's tires. On one of these occasions, defendant fired two shots toward Burgos.

2

**2.       Incident giving rise to conviction in this case**

On January 24, 2012, Burgos went to a hamburger restaurant with Rosalind Banks. As they sat waiting for their food, defendant came into the restaurant carrying a bat. Defendant yelled at Burgos, then hit him with the bat in the ribs, on the shoulder, and on his legs or knee. Burgos was unarmed and did not threaten defendant or act aggressively. Defendant began to leave, but either Banks or Burgos said something to him, so he returned and struck Burgos's head once with the bat. Burgos testified he had walked to the door of the restaurant to talk to defendant before defendant struck him, but his memory of the incident was unclear due to his injuries. Three other witnesses testified defendant simply walked up to Burgos and struck him with the bat.

Burgos lost consciousness for several minutes, but Banks awakened him when the paramedics arrived. Burgos was taken to a hospital, where they put in a trachea tube and removed all of his teeth. He thought he stayed in the hospital for two months before moving to a convalescent home. Burgos testified he was "in a coma for six weeks," but also testified the hospital put him in restraints because he was trying to pull out the trachea tube and wanted to move around. He further testified, "I was unconscious or sub unconscious. Sometimes I would talk, sometimes I wouldn't." At the time of trial, Burgos still had sore ribs and shoulders and walked with a cane. He had received injections in his shoulders, ribs, hip, and knee to assist him in walking.

**3.       Defendant's postarrest statement**

On March 8, 2012, while Los Angeles Police Department Officer Scott Alpert booked defendant into custody, Alpert said, "'So hypothetically, I'm not saying that you did it, but hypothetically, if you did hit him with the bat, you messed him up real bad. You slit his head open and you put him in a coma.'" Defendant replied, "'I heard they pulled the plug on him. Whatever. He slashed my tires because I'm Black.'" Defendant then said, "'Well, I shot him with my deuce deuce and they didn't say anything any ways, so the caneze [*sic*] is better off any ways.'"

3

**4.      Defense evidence**

Bruce West testified someone cut his brake line in December of 2011 while he was visiting his girlfriend, who lived in the same neighborhood as Burgos. Banks told West Burgos had cut the brake line and West should "watch out." Burgos later pulled a machete on West. West knew Burgos had slashed the tires on four or five cars in the neighborhood. Gerald Heywood, who also lived in the neighborhood, testified Burgos had pulled a knife on his teenage son and tried to stab him.

June Carver testified she accompanied defendant to the hamburger restaurant on January 24, 2012. Before they got out of the car, Burgos emerged from the restaurant, appeared to be agitated, and "gestured" as if he had a weapon. Burgos then rushed toward their car. Defendant and Carver got out of the car, and defendant and Burgos began pushing one another. Burgos acted as if he had something behind his back. Defendant retrieved a bat, Burgos ran back into the restaurant, and Carver ran to an alley.

**5.      Verdict and sentencing**

Defendant was originally charged with six counts, but all charges other than two attempted murder counts were dismissed before trial. The jury acquitted defendant of both counts of attempted murder, but convicted him of assault with a deadly weapon with respect to the incident at the restaurant. It could not reach a verdict with respect to lesser included offenses for the other count. The court declared a mistrial as to that count and ultimately dismissed the charge in the interest of justice. The jury further found true allegations defendant personally used a deadly weapon and personally inflicted great bodily injury. Defendant contested the applicability of, but nonetheless admitted, an allegation he had served a prior prison term within the scope of Penal Code section 667.5, subdivision (b).[1]

At the sentencing hearing, the court agreed with defendant that the five-year "washout" period was applicable to his prior prison term, and the court therefore struck

---

[1] Undesignated statutory references are to the Penal Code.

4

the section 667.5, subdivision (b) enhancement.  The court sentenced defendant to nine years in prison, including a five-year section 12022.7, subdivision (b) enhancement.

DISCUSSION

**1.      Defendant's waiver of his right to counsel was knowing, intelligent, and voluntary.**

        **a.      Proceedings in the trial court**

Defendant was apparently represented by a succession of attorneys who asked to be relieved.  On October 9, 2012, the court was about to appoint a new attorney for defendant when defendant announced, "I am exercising my *Faretta* rights."  The court placed the case on second call and sent defendant to a holding cell.  When defendant returned, the court recounted some of his "disruptive" behavior and "propensity for violence," and inquired whether defendant was asking to represent himself to avoid additional delay in his case.  Defendant said he was "ready to go to trial" and did not want anyone's assistance.  He added, "There is no victim."  Upon further questioning, defendant reiterated he was ready to go to trial and did not want any additional continuances.  Defendant then said, "Let's talk about the poisonous fruit."  The court responded, "Keep it up.  I will tell you this.  I don't think there is a way in the world that you can represent yourself but you want to do it, I will give you some papers.  Here is where you will have some problems based on your back history."  The court told defendant he would be "given a series of papers to read and understand and sign."  The court put defendant back in a holding cell with the forms.

Defendant filled out and signed an "Advisement and Waiver of Right to Counsel (*Faretta* Waiver)" form that instructed defendant to "[i]nitial each box for each applicable item only if you understand and agree with it . . . .  If you have any questions about anything on this form, ask the judge."

In the "Constitutional Rights" section of the form, defendant initialed each of seven separate points advising him of his constitutional rights to counsel, to a speedy jury trial, to subpoena witnesses and records, to confront and cross-examine witnesses, to be

5

released on bail, to self-representation, and to testify, as well as his privilege against self-incrimination. He also initialed a representation that he could read and write and understood each of the enumerated rights. With respect to his right to self-representation, the form stated, "I understand that I have a right to self-representation and may waive my right to counsel. I further understand that if I am permitted to represent myself, I will have to conduct my own defense WITHOUT THE ASSISTANCE OF A LAWYER."

In the "Background" section of the form, defendant wrote that he was 43 years old and had graduated from high school. He did not indicate any other formal education, legal education, or experience as a pro. per.

In the "Dangers and Disadvantages to Self-Representation" section of the form, defendant initialed each of 13 separate points advising him he would have to "follow all the technical rules of substantive law, criminal procedure, and evidence"; the case against him would be handled by "an experienced trial attorney"; he would "not be entitled to any special consideration or assistance" or "special treatment" from the court; it would be necessary for him to handle all pretrial motions, plea negotiations, jury selection, opening statement and closing argument, cross-examination of prosecution witnesses, subpoenaing and presenting his own witnesses, proposing jury instructions, making appropriate objections and motions during trial, and making appropriate motions after trial; he would be required to substantiate requests for additional funds with receipts for his spending; his custodial status and limited telephone and library access would make trial preparations, including investigating and contacting witnesses, difficult; he would have to show good cause to obtain a continuance and any continuance request just before trial was likely to be denied; a subsequent request to be represented by counsel might be denied, depending upon the stage of the proceedings, and if it were granted, counsel might be "in a disadvantaged position"; he would be required to remain seated at counsel table during the trial; he "must not abuse the dignity of the Court," and the court could terminate his self-representation for "serious misconduct," obstructing "the conduct and progress of the trial," or misconduct outside of court; if the trial court terminated his self-

6

representation, an appointed attorney would "take over the case at whatever stage" it might be in; his pro. per. status would not shield him from jail discipline; and he would be unable to assert ineffective assistance of counsel on appeal.

In the "Charges and Consequences" section of the form, defendant initialed the box next to "I understand that I am charged with the following crime(s)," but did not list any charges. He checked the "Yes" box for three questions asking whether he knew (1) the charges against him were general or specific intent crimes, (2) what facts had to be proved to convict him, and (3) what the legal defenses to the charges were.

In the "Court's Advice and Recommendation" section, defendant initialed boxes stating he understood the court recommended he accept court-appointed counsel instead of representing himself, and if he accepted counsel the court would appoint "an experienced trial lawyer" who would be able to investigate his case, file pretrial motions, and advise him. Defendant indicated he understood the waiver of counsel form would become part of the case file and would be considered by an appellate court in determining whether he had knowingly and intelligently waived his right to counsel. He further acknowledged, "I understand all that I have read and all that the Court has told me. It is my personal desire that I be granted permission by the Court to proceed in propria persona. I understand that by making this request I am giving up the right to be represented by a lawyer."

Finally, above his signature, defendant further acknowledged, "I hereby certify that I have read, understood and considered all of the above warnings included in this petition, and I still want to represent myself. I freely and voluntarily give up my right to have a lawyer represent me."

When defendant returned to the courtroom with the completed paperwork, the court confirmed that the initials and signature on the Advisement and Waiver of Right to Counsel form and the signature on a Los Angeles County Pro Per Policy Memorandum were defendant's. The court then stated, "You are your own lawyer. What do you want

7

to do?"  Defendant replied, "Turn over the poisonous fruit."  The court directed staff to return defendant to a holding cell and get a camera.

When defendant returned to the courtroom, the court again asked what he wanted to do.  He replied, "Ready to go to trial as soon as possible."  The court set the trial and told staff to take defendant away, but defendant asked if he could "get the discovery."  The court replied, "I don't know.  You have to do what you have to do as a lawyer."  Defendant responded, "Turn over the discovery."  The court said, "You will just walk away."  Defendant responded, "Actually to turn over the poisonous fruit."  The court told defendant he had "to do these things correctly."  Defendant reiterated, "Turn over the discovery."  The court responded, "You don't tell me to turn over the discovery.  There are procedures you have to follow."  Defendant stated, "Turn over the poisonous fruit."  The court replied, "I am about to make a decision that I don't think you are a suitable candidate under any test to be representing yourself because of your attitude, your failure to understand what I am trying to tell you.  But I will tell you this once more and we are all done.  You will follow the rules as it relates to pro pers and you will be treated just like it tells you in those papers same as any lawyer."  When the court finished, defendant again asked, "Like for you to turn over discovery," and added, "I will bring it back in 2 days after I do research when I get it."  The court responded, "You don't tell me what to do.  We are finished."  Defendant then said, "I said go to Jamaica and find you a victim."

Seven weeks later, the case was dismissed and refiled.  At defendant's arraignment, a different bench officer asked defendant if he still wanted to represent himself.  Defendant replied, "Yes."  The court asked again, "So you don't want to change that status; is that correct?"  Defendant responded, "Correct." The court asked a third time, "You want to remain pro per?"  Defendant again said, "Yes."  The court stated, "So I'll grant that because he's already filled out a *Faretta* advisement on a previous case and elected to go pro per.  I don't think we have to go through it again.  He's indicating he wants to stay pro per."

The court then asked defendant, "[D]o you plead not guilty and deny all the allegations?" Defendant asked, "What are the allegations?" The court told defendant, "The same charges as before, sir, and allegations. Count 1—there are six counts and—." The prosecutor interrupted, saying he was "presenting [defendant] with the copy of the new complaint." The prosecutor further stated he was providing defendant with copies of discovery. Defendant then entered a not guilty plea.

Defendant represented himself at all ensuing proceedings, including his preliminary hearing, trial, and sentencing.

Defendant contends his waiver of his right to counsel was not knowing and intelligent because the trial court failed sufficiently to advise him of the dangers and disadvantages of self-representation and ascertain whether his waiver was knowing and intelligent. He notes he did not list the charges on the waiver form, the court expressed doubts about defendant's ability to represent himself, and the court did not advise him of his "potential exposure" or "other pitfalls of self representation" or "ascertain that [he] was knowingly and intelligently waiving his right to counsel." In his reply brief, defendant cites his "bizarre and unusual behavior evidencing that [he] was not a suitable candidate to represent himself," and faults the court for failing to conduct an inquiry "to determine whether [defendant] had the capacity to make an intelligent waiver."

### b.    Exercising the right of self-representation

A criminal defendant has a Sixth Amendment right to represent himself at trial. (*Faretta*, *supra*, 422 U.S. at p. 821.) "'A trial court must grant a defendant's request for self-representation if the defendant knowingly and intelligently makes an unequivocal and timely request after having been apprised of its dangers.'" (*People v. Williams* (2013) 58 Cal.4th 197, 252.)

Because a knowing and intelligent waiver of the right to counsel is required, a defendant seeking self-representation "should be made aware of the dangers and disadvantages of self-representation." (*Faretta*, *supra*, 422 U.S. at p. 835.) The test of a valid waiver of counsel is not whether specific warnings were given or particular words

9

used, but whether the record as a whole shows that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case. (*People v. Lawley* (2002) 27 Cal.4th 102, 140.) It makes no difference whether the court's advisement is written or oral. (*People v. Blair* (2005) 36 Cal.4th 686, 709 (*Blair*), overruled on a different ground by *People v. Black* (2014) 58 Cal.4th 912, 919.)

In assessing whether a defendant validly waived his right to counsel, we review the entire record, not just the record of the *Faretta* hearing, and determine de novo whether there win a knowing, intelligent, and voluntary waiver of the right to counsel and invocation of the right of self-representation. (*People v. Doolin* (2009) 45 Cal.4th 390, 453; *People v. Koontz* (2002) 27 Cal.4th 1041, 1070.) Defendant has the burden of showing he did not knowingly and intelligently waive his right to counsel, and he does not satisfy his burden by merely identifying certain advisements that were not given. (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1058.)

### c.     Defendant has not established the ineffectiveness of his waiver

Although defendant did not list the charges on the waiver form and got off to a rocky start at the *Faretta* hearing, a review of the entire record demonstrates the knowing, intelligent, and voluntary character of defendant's waiver of counsel. The record shows defendant understood the charges and his potential sentencing exposure, was able to formulate a theory of defense, ultimately obtained and knew the contents of the discovery and was ready and able to use it in his defense, and was both prepared to represent himself at trial and capable of doing so in a logical, articulate, and intelligent fashion.

Just before trial commenced defendant told the court he understood his maximum possible sentence to be two life sentences plus 23 years. He later discussed the section 667.5, subdivision (b) enhancement allegation with the court in a fashion that demonstrated he was both aware of it and understood it. He challenged its applicability on the ground he had been free of custody for five years, and ultimately was proven correct on this point.

10

Defendant made several pretrial and posttrial motions, including motions for discovery, appointment of an investigator and a handwriting expert, additional funds for his investigator, continuances of the probation and sentencing hearing, and trial transcripts. He cross-examined every prosecution witness, impeaching several with prior inconsistent statements from police reports and the preliminary hearing, and asking Burgos about his use of a machete in the incident with Sharp's son and a statement he made in that incident. Defendant presented and examined four witnesses of his own, introduced his own exhibits (all of which were admitted without objection), and argued his theory of the case to the jury. Over the prosecutor's objections, defendant convinced the court to instruct upon attempted involuntary manslaughter, assault with a firearm, and assault with a deadly weapon as lesser included offenses.

At the probation and sentencing hearing defendant successfully moved to strike the section 667.5, subdivision (b) enhancement because he had been free from custody for more than five years after the prior prison term and unsuccessfully moved to strike the great bodily injury enhancement on the ground a doctor did not testify. Defendant also had a notice of appeal ready to file at the hearing.

Although it would have been preferable for the trial court to have reviewed the waiver form with defendant or asked him about his responses, it was not required to do so, and its failure to do so does not invalidate defendant's waiver. (*Blair*, *supra*, 36 Cal.4th at p. 709.)

Defendant suggests his behavior suggested mental illness and the trial court had doubts about his competence to represent himself. However, defendant's unusual statements about discovery and poisonous fruit immediately after the trial court granted his *Faretta* motion did not necessarily reflect an incoherent thought process or an inability to understand or communicate coherently, as opposed to a misunderstanding regarding procedure and terminology. The trial court specifically stated it did not think defendant was a "suitable candidate" to represent himself "because of [his] attitude" and his "failure to understand" what the court was telling him, not because of doubts about

11

his mental competence. On a few occasions during the trial, defendant continued to argue with the court over a ruling he disagreed with, but he generally behaved himself well, complied with the court's instructions, and interacted appropriately with the court, prosecutor, witnesses, and court staff. The record as a whole clearly demonstrates defendant understood the nature of the proceedings and was able to represent himself. In any event, a "trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*People v. Johnson* (2012) 53 Cal.4th 519, 530.)

## 2. The trial court prejudicially erred by failing to instruct on an element of the great bodily injury enhancement.

### a. Proceedings in the trial court

The information alleged a great bodily injury enhancement pursuant to section 12022.7, subdivision (b), which provides, in pertinent part, for a five-year enhancement on a "person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury."

The trial court, however, did not give the instruction that is specifically designed for section 12022.7, subdivision (b), the five-year enhancement for great bodily injury that causes the victim to become comatose due to brain injury. Instead of giving that instruction, CALCRIM No. 3161, the court gave CALCRIM No. 3160, which is designed specifically to apply to section 12022.7, subdivision (a), a three-year enhancement for great bodily injury that does not involve a coma due to brain injury. As given, CALCRIM No. 3160 provided: "If you find the defendant guilty of the crimes charged in Count 1 or the lesser crimes of attempted voluntary manslaughter or assault with a deadly weapon, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally inflicted great bodily injury on Frank Burgos in the commission or attempted commission of that crime. You must

12

decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

The verdict form completed by the jury cited section 12022.7, subdivision (b), but also did not refer to the victim becoming comatose due to brain injury. The court imposed a five-year enhancement, citing section 12022.7, subdivision (b).

Defendant contends the enhancement must be reduced to a three-year, section 12022.7, subdivision (a) enhancement because the jury was not instructed to determine, and thus did not find, Burgos became comatose due to brain injury. We agree.

### b. Duty to instruct and requirement of jury finding

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.) This includes instructing on all of the elements of a charged enhancement. (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1380.)

Moreover, due process and the right to a jury trial require any fact, other than a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum to be charged, submitted to a jury, and proved beyond a reasonable doubt. (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [120 S.Ct. 2348].) The "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (*Blakely v. Washington* (2004) 542 U.S. 296, 303 [124 S.Ct. 2531].) Accordingly, failure to instruct the jury on an element of a sentencing enhancement allegation violates federal constitutional rights to due process and a jury trial. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 326 (*Sengpadychith*).)

Instructional error in omitting an element of an enhancement allegation is subject to harmless error analysis under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824], i.e., reversal is required "unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 326.) Such an error may be found harmless where the defendant concedes or admits that element (*People v. Flood* (1998) 18 Cal.4th 470, 504), "*all* of the evidence at trial relevant to the issue in question" establishes "there is no rational basis upon which the instructional error could have affected the jury's verdict" (*id.* at p. 505), or other properly given instructions fully addressed the omission (*People v. Holt* (1997) 15 Cal.4th 619, 677).

**c.      The trial court prejudicially erred by failing to instruct upon all of the elements of a section 12022.7, subdivision (b) enhancement**

CALCRIM No. 3161 includes the element that "[t]he defendant's acts caused [victim's name] to [] become comatose due to brain injury." Omission of this element from the instruction the court actually gave meant the jury was not asked to make a finding on the element. Because the trial court increased defendant's sentence by imposing the section 12022.7, subdivision (b) enhancement, the court's instructional error constituted federal constitutional error.

The Attorney General has not carried its burden of showing the error was harmless beyond a reasonable doubt. Defendant consistently contested whether Burgos was actually in a coma at all, and if he was, whether the coma resulted from brain injury, as opposed to another cause, such as diabetes. No medical professional testified at trial and no hospital records were introduced. The evidence that was introduced left room for reasonable doubt whether Burgos was in a coma at all, much less one caused by brain injury.

Carolyn Jones testified that when she visited Burgos in the hospital, "[A]t first he wasn't communicating. I think he was in a coma, a deep sleep, or however they call it." Burgos testified he remembered waking up in the hospital and they told him to hold still;

14

he thought he stayed in the first hospital about two months, but he was not sure because he was "unconscious or sub unconscious. Sometimes I would talk, sometimes I wouldn't." Later, Burgos testified he was "in a coma for six weeks, I think." On cross-examination, however, he admitted he was in restraints in the hospital because he "was pulling out my trach [*sic*]" in "anxiety" and "desperation" because he "wanted to move" his body. Defendant's postarrest statement to Officer Alpert was nothing more than a response to Alpert's assertion that Burgos was in a coma. As far as the record reveals, Alpert did not participate in the investigation of the case, but merely booked defendant. Nothing indicates he had personal knowledge of Burgos's medical condition. Accordingly, the evidence that Burgos may have been in a coma caused by brain injury was far from compelling, and there is a rational basis upon which the instructional error could have affected the jury's verdict.

We reduce the enhancement to the section 12022.7, subdivision (a) enhancement upon which the jury was instructed.

## 3. Defendant forfeited his claim regarding his exclusion from an in camera review of prior convictions of the victim and prosecution witnesses.

Just before trial commenced, defendant requested the criminal histories for Burgos and "all of the material witnesses." The prosecutor asked the court to examine the records in camera. The court explained to defendant that the prosecutor would give the court the criminal history records and the court would "go through them and determine what is appropriate discovery, that means to be turned over to you for possible impeachment . . . ." Defendant did not object, and the court conducted an in camera review with the prosecutor, during which it decided to reveal only some of the convictions of three prosecution witnesses who testified at trial.

Defendant contends his exclusion from the in camera review violated his right to counsel at a critical stage of the proceedings. However, defendant forfeited his claim by failing to object to his exclusion on this (or any other) ground. (*In re Sheena K.* (2007)

15

40 Cal.4th 875, 880–881.) The trial court explained what it proposed to do, and defendant acquiesced. He cannot now complain of his exclusion.

**4.     Defendant forfeited his claim regarding the amount of statutory fines.**

**a.     Proceedings in the trial court**

At the sentencing hearing, the trial court stated it was imposing $280 restitution and parole revocation fines pursuant to sections 1202.4, subdivision (b), and 1202.45, subdivision (a). The court did not explain the amount of the fines and defendant did not object. The minute order of the sentencing hearing and the abstract of judgment reflect the amount of these two fines as $240.

Defendant contends the court erred by utilizing the $280 minimum fine applicable to offenses committed on or after January 1, 2013, instead of the $240 minimum applicable to offenses committed in 2012.

**b.     Correction of sentencing errors**

Where the sentence imposed includes a period of parole and the court imposes a restitution fine under section 1202.4, subdivision (b), it must also impose a parole revocation restitution fine in an equal amount. (§ 1202.45, subd. (a).) "The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense," but cannot be less than $240 (for crimes committed in 2012) or more than $10,000. (§ 1202.4, subd. (b)(1).)

We may correct an unauthorized sentence whenever it comes to our attention. (*People v. Autry* (1995) 37 Cal.App.4th 351, 364.) However, complaints about the manner in which the trial court exercises its discretion or articulates its reasons cannot be made for the first time on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 356.)

**c.     Defendant forfeited his claim**

The trial court was statutorily authorized to impose restitution and parole revocation fines up to $10,000. Accordingly, the $280 fines imposed by the court are not an unauthorized sentence, and defendant's failure to object in the trial court precludes him from raising the issue on appeal.

## DISPOSITION

The Penal Code section 12022.7, subdivision (b) enhancement is reversed and modified to be a Penal Code section 12022.7, subdivision (a) enhancement, with a term of three years.  Defendant's sentence is accordingly modified to be seven years, in total.  The judgment is otherwise affirmed.  The trial court is directed to issue an amended abstract of judgment reflecting the correct authority for the enhancement, along with the correct term of three years for the enhancement and the correct aggregate term of seven years.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.