Filed 10/8/20  P. v. Hatcher CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT HATCHER,<br><br>    Defendant and Appellant. | D076078<br><br><br><br>(Super. Ct. No. SCN392247) |

APPEAL from a judgment of the Superior Court of San Diego County, David G. Brown, Judge.  Affirmed.

Kelly E. DuFord, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Robert Hatcher was charged with a single count of robbery (Pen. Code, § 211)[1] after he pushed, kneed, and kicked a thrift store employee who tried unsuccessfully to stop Hatcher from stealing merchandise. Hatcher represented himself throughout two trials. The jury at the first trial was unable to reach a verdict, but the jury at the second trial found him guilty. The trial court sentenced Hatcher to the upper term of five years.

Hatcher raises several issues on appeal. First, he contends the trial court erred by failing to appoint counsel or conduct a competency hearing after doubt arose as to his mental competence. Although the appellate record suggests Hatcher has mental health issues that gave the trial court some concern, the record does not indicate those issues raised a doubt sufficient to compel the court to investigate Hatcher's competence.

Second, Hatcher contends the trial court violated his right to counsel by denying a posttrial motion to continue the sentencing hearing so that he could retain counsel for posttrial proceedings, and by failing to appoint counsel when a doubt arose as to his mental competence. This challenge fails because the motion was not an unequivocal request by Hatcher to revoke his self-represented status and, even if it were, the court did not abuse its discretion by denying the belated motion. Moreover, the competency-based claim fails in this context primarily for the same reasons as his general competency-based challenge.

Third, Hatcher asks us to remand the case so the trial court can consider whether to grant him pretrial mental health diversion under section 1001.36, which took effect months before Hatcher was charged. By failing to request pretrial diversion in the trial court, Hatcher forfeited this issue on

---

[1]     Further undesignated statutory references are to the Penal Code.

2

appeal. And, in any event, the trial court's comments before and during sentencing indicate a remand would be futile.

Finally, Hatcher contends the trial court prevented or dissuaded him from presenting evidence regarding his mental health. The appellate record contradicts this claim.

Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Hatcher was charged by complaint with a single count of robbery based on the theory he peaceably took possession of merchandise in a thrift store, and then used force or fear to retain the merchandise when confronted by a store employee. Hatcher represented himself in the trial court.

### *Prosecution Evidence*

On August 16, 2018, Hatcher entered a thrift store in Carlsbad that raises money for domestic-violence victims and the homeless. Sonia M. was working as a sales associate, Rosanne O. was managing the store, and Lisa M. was volunteering. Sonia and Rosanne had seen Hatcher shoplift from the store on several prior occasions.

On this occasion, Sonia reported to Rosanne that Hatcher entered the store and was holding a voucher, which churches commonly distribute to the homeless. Vouchers are only issued in the amount of $10. Rosanne told Sonia to "just keep an eye on" Hatcher. Sonia then observed Hatcher put several pieces of clothing in a suitcase, which was also for sale. At Rosanne's direction, Sonia asked Hatcher if he would like her to hold the merchandise for him behind the counter as he shopped. Hatcher declined, and Sonia continued to watch him.

Hatcher grabbed two shirts from inside the store, then attempted to walk out without paying. He did not stop at the sales counter or leave the

$10 voucher. Sonia tried to stop Hatcher by closing and locking the front door, but she was too nervous to get the key out of her purse. Hatcher called Sonia a "[s]hort, fat [racial epithet]"; pushed her shoulder; kneed her thigh; and kicked her ankle. Sonia fell down, and her knee immediately turned purple and became swollen. She screamed for help.

Rosanne and Lisa both responded. Lisa positioned herself between Hatcher and Sonia, and took back one shirt from him. Hatcher told the workers, "Fuck all you guys," and left the store with the suitcase full of merchandise, all of which was worth about $40. Lisa called 911, gave the phone to Rosanne, then followed Hatcher outside to see where he went. Rosanne also went outside and warned Hatcher she was calling the police. Hatcher responded by giving her "the middle finger" and "walking like not a care in the world." Hatcher managed to get away.

About five months later, police arrested Hatcher on an arrest warrant for robbery stemming from the thrift store incident.

At trial, the prosecution introduced records showing Hatcher had pleaded guilty to larceny and shoplifting after he returned to the thrift store in December 2018 (about four months after the alleged robbery) and stole more merchandise. The prosecutor also cross-examined Hatcher about punching a hardware store employee in the face when the employee tried to stop Hatcher from stealing batteries.

### Defense Evidence

Hatcher testified as the lone defense witness, denying he used force or fear to take the merchandise. Instead, he maintained he had a voucher that entitled him to an entire outfit (not merely for $10); that he tendered it to Sonia before leaving the store; that Sonia said it was not enough to cover the cost of the merchandise; so he left the voucher on the counter and took the

4

merchandise.  Hatcher admitted he became "a little upset" because, although Sonia sometimes used her own money when a homeless customer's voucher was insufficient to cover the cost of merchandise, she refused to do so for Hatcher (because he had previously shoplifted from the store).[2]  Hatcher denied ever touching Sonia, and claimed she must have mistaken him for someone else who had.

## *Verdict and Sentencing*

After a first trial, the trial court declared a mistrial when the jury deadlocked 11 to one in favor of guilty.

After a second trial, the jury deliberated for just 17 minutes before returning a guilty verdict.

Based on Hatcher's extensive criminal record, the increasingly violent nature of his offenses, and the disparity in size between Hatcher and Sonia, the court followed the probation officer's recommendation and sentenced Hatcher to the upper term of five years in prison.  The court also ordered Hatcher to pay $1,763 in fines, fees, and assessments; and $40 in restitution to the thrift store.

## DISCUSSION

### I. *Mental Competency*

If "a doubt arises in the mind of [a] judge as to the mental competence" of a self-represented defendant, the judge must state that doubt on the record and appoint counsel.  (§ 1368, subd. (a).)  If counsel or the court believe the defendant is mentally incompetent, the court must suspend criminal proceedings and conduct a competency hearing.  (§ 1368, subds. (b)-(c).)

---

[2]     Hatcher also testified he became angry because he has bipolar disorder, but the trial court struck this testimony as nonresponsive.

Hatcher contends the trial court violated his due process rights by failing to appoint counsel and conduct a competency hearing even after (1) he moved to continue the sentencing hearing to have counsel appointed "because of [his] mental state at the time"; and (2) his conduct during trial caused the court to "harbor[] a doubt as to [his] competency." We are not persuaded. Hatcher's motion was not an unequivocal request to revoke his self-represented status for purposes of pursuing a competency hearing, and his conduct during trial did not raise a sufficient doubt about his competence so as to compel the court to appoint counsel or conduct a competency hearing.

## A. *Background*

### 1. *Self-Representation*

Following his arrest in January 2019, Hatcher was arraigned, the court appointed the public defender's office to represent him, and he pleaded not guilty. He remained in custody on $100,000 bail.

Within 10 days of being arraigned, Hatcher moved to represent himself. The trial court's minutes reflect that Hatcher signed and filed a "Faretta/Lopez Waiver"[3] indicating he understood the rights he was giving up—and the risks he was taking on—by choosing to represent himself. The court (Judge Goldstein) granted the motion, relieved the public defender, and appointed the Office of Assigned Counsel (OAC) to act as Hatcher's legal runner and to provide ancillary services.[4]

---

[3] *Faretta v. California* (1975) 422 U.S. 806, 819; *People v. Lopez* (1977) 71 Cal.App.3d 568, 572.

[4] Neither the "Faretta/Lopez Waiver" nor a reporter's transcript of these proceedings are in the appellate record.

6

## 2. *Preliminary Hearing*

Hatcher's preliminary hearing was initially assigned to Judge Elias, but Hatcher challenged the judge (Code Civ. Proc., § 170.6), and the matter was reassigned to Judge Washington.

At the outset of the preliminary hearing, the court noted it had received via email from OAC a document that was "labeled [a] motion to dismiss," but which really "seem[ed] to be . . . a request to subpoena" two psychotherapists. As to the procedure of Hatcher's "motion," the court explained that because it was insufficient to merely *file* subpoenas with the court—he had to actually *serve* them on the subpoenaed parties—the court could not "take any action[]"on the motion. The court advised Hatcher to seek assistance from OAC if he wanted to serve subpoenas in the future.

Regarding the subject of Hatcher's subpoenas, the court expressed concern that Hatcher was suggesting there was "something about [his] mental condition" that he believed precluded liability. Hatcher replied, "That is not true, your Honor." After noting the obvious tension between self-representation and pursuit of an insanity defense, the court confirmed it did not "find anything about [Hatcher's] mental condition as [he] appear[ed] in court now that suggests to [the court] that [he is] incapable of representing [him]self." The court also admonished Hatcher that it may be "self-defeating" to pursue a mental health-based defense: "The fact that you're saying I am capable enough to know that there is a mental health problem may suggest to some other judge that you don't have one because you knew enough to try to raise it."

During the ensuing preliminary hearing, Hatcher cross-examined all the prosecution witnesses and testified in his own defense. The court held Hatcher to answer.

7

### 3. *Trial Readiness Conferences*

In advance of a March 2019 trial readiness conference, Hatcher filed 16 motions. Some of the motions related to (1) evidence Hatcher asserted would support his claim that he had left a voucher on the thrift store counter the day of the incident; (2) alleged deficiencies in a photo lineup the police had conducted; (3) impeachment or exclusion of prosecution witnesses based on conflicts in their preliminary hearing testimony and a recording of the 911 call; and (4) a request that the court appoint an investigator as an expert witness. The trial court (Judge Kirkman) deferred many of the evidentiary motions to the trial judge.

As to the motion requesting appointment of an investigator as an expert witness, the court explained that factual investigation is not an expert issue; rather, it is an issue for him to coordinate with OAC. The court advised Hatcher there may be areas where he and OAC disagree about whether investigation is "appropriate." For example, the court noted Hatcher had requested, without basis, that OAC subpoena Michelle Obama. Hatcher then mentioned that he would like his psychiatrist in Chicago to testify as an expert. The court responded that it would not bring a witness from Chicago, but left open the possibility of appointing a psychotherapist if Hatcher "establish[ed] a basis" and coordinated with OAC and the supervising judge.

Another of Hatcher's motions requested that his bail be reduced on the grounds the evidence against him was false. The court indicated his bail had already been reduced from $100,000 to $50,000 (the record does not explain why), and explained credibility issues were a matter for trial.

A few weeks later, the trial court (Judge Danielson) held a further readiness conference and bail review. During the readiness portion, the prosecution offered Hatcher the low term of two years. Hatcher countered

8

with "time served and on probation and to seek help with . . . get[ting] back on my medication of being bipolar." Hatcher argued this was reasonable because the prosecution would not be able to prove the robbery count in light of his claim he had a thrift store voucher. The prosecution rejected the counteroffer.

During the bail review portion, Hatcher argued for a further reduction because his charge stemmed from "a misunderstanding"—when the store would not accept his voucher, he "got upset and just stormed out because [he] wasn't taking [his] medication" for bipolar disorder. Hatcher told the court his "psychiatrist [in Chicago] could explain that situation." Based on an apparent history of failing to appear for hearings, the court left Hatcher's bail at $50,000.

### 4. *First Trial*

In connection with the first trial, Hatcher filed numerous pretrial and in limine motions addressing his theories about the voucher and the "tainted" photo lineup procedure. Hatcher also moved to preclude the prosecutor from impeaching Hatcher with his prior convictions. The court (Judge Brown) denied or deferred the motions.

Trial was initially delayed when Hatcher claimed a medical emergency. The court admonished Hatcher that if his medical condition caused further delay, the court would revoke his self-represented status.

Once trial began, Hatcher gave an opening statement and cross-examined all prosecution witnesses. Hatcher did not present any defense witnesses, and had no proofs of service for the witnesses he claimed to have subpoenaed. He moved unsuccessfully to compel Judge Washington's appearance to testify about the preliminary hearing. Hatcher did not give a closing argument because he was taken to receive medical treatment.

During deliberation, the jury asked several questions, then indicated a single juror was refusing to deliberate any further. The court inquired whether the parties would agree to replace the holdout juror with an alternate, but Hatcher refused. The court found the jury was "hopelessly deadlocked," declared a mistrial, and set a new trial date for one week later.

### 5. *Second Trial*

At the outset of the second trial, the court (Judge Brown, again) warned Hatcher, "upon pain of exclusion[,] to follow courtroom decorum." The court noted Hatcher had previously feigned seven heart attacks, and advised Hatcher the court would not delay trial for purported medical issues.

Hatcher again made several motions in limine addressing his voucher/receipt theory. Although the court denied these motions, it granted Hatcher's motion seeking permission to impeach prosecution witnesses "if [he] can do it appropriately."

In addressing other pretrial motions, Hatcher noted he had had disagreements with OAC, which had not complied with his requests for an investigator. Hatcher insisted, "I'm supposed to be the attorney, not them," and "[t]hey [are] supposed to follow my instructions." The court responded that although Hatcher's behavior provided "substantial reason to revoke [his]" self-represented status, doing so would be "fruitless" in light of the delay it would cause and the court's observation that Hatcher "ha[s] no intention of seeking anyone's advice other than [his] own."

Once trial began, Hatcher participated in voir dire, gave an opening statement, cross-examined all prosecution witnesses, testified in his own defense, participated in the jury instruction conference, and gave a closing argument.

10

After the jury returned its guilty verdict, the court set the sentencing hearing for about one month later. When Hatcher asked "why . . . it take[s] a month," the court responded that it wanted a probation report so the court could make an informed decision that balanced Hatcher's needs against the interest in public safety:

> "I want Probation to talk to you, to take a look at your various issues. And other than two years in jail—and I can't imagine it would be anything but local time. State prison will do you absolutely no good, Mr. Hatcher. It would be even more detrimental. So I'm wanting to come up with a plan where, between the People, you and me, we can come up with a way to best handle your issues, which I feel are not just medical, but I feel you have some additional issues that we would like to address to assist you. And also at the same time, we have to do our best to ensure that the public is safe because . . . the jury found that you obviously attacked [Sonia]. The jury found that. And the other incident at the [hardware store], which I did not know until it came up in evidence, I think that shows that if you were left out on the streets that you would be a danger to public safety."

Before the court adjourned, it encouraged Hatcher to cooperate in earnest with the probation officer:

> "But I'm just urging you, Mr. Hatcher. Go into Probation in an accepting frame of mind. And between all three of us, we can fashion a sentence that would meet the criteria that the State requires us to consider, but also Probation will allow you to get some help, both medically and psychologically, because to be quite blunt, Mr. Hatcher, I think you have difficulty. And why—and maybe you were. I don't know if you ever went through a Penal Code [section] 1368 examination, but . . . I'll say this on the record and will continue to say it. I have some real doubts about your mental competence. But you got to this point, and the Court repeatedly allowed you to defend yourself. And I think you did yourself a disservice by defending yourself. But be that as it may, we are forced—we're here.

11

You've been convicted of . . . felony robbery. Okay? It is a strike. There are ways to play these things, Mr. Hatcher. And again, I doubt very seriously that . . . Probation would recommend or I certainly wouldn't recommend that you go to state prison. I don't think it would do a darn bit of good for you. But that's not here. Okay? So go in there openly, and don't make demands. Don't try to bargain. And find out what the County of San Diego can do for you. They have a lot of resources."

## 6. *Probation Report*

The probation report indicated Hatcher had an extensive criminal history: 137 arrests, 18 misdemeanor convictions, 13 felony convictions, nine grants of summary probation, and five grants of formal probation.

The report also indicated Hatcher stated he had been diagnosed with bipolar disorder in the 1980's but was not currently taking any medication. Hatcher "said he is 'okay' when he is not around people, but he believes he may need an assessment for possible use of psychotropic medications."

The probation officer recommended that the court impose the upper term of five years.

## 7. *Sentencing*

On the day of the sentencing hearing, Hatcher filed a one-page, handwritten motion titled "motion for continuance, to hire a[n] attorney, for a new hearing, and jury trial." (Capitalization omitted.) The entire substance of the motion reads:

> "Now comes the defendant Robert Hatcher, pro per and respectfully request[s] a continuance, to have a[n] attorney, to prepare for a preliminary hearing and if needed, other defense hearings, also if need[ed] a jury trial[.] [¶]

12

Exhibits [are] attach[ed] to this motion."[5] (Capitalization omitted.)

At the outset of the hearing, the trial court announced its tentative decision was to follow the probation officer's recommendation and impose the five-year upper term. When the court asked Hatcher if he would like to "attempt to have the Court change its mind," Hatcher replied, "Yes, your Honor. I filed a motion to have [a] continuance to have an attorney to represent me because of my mental state at the time." The court responded,

> "[T]his is the time set for sentencing. And I was going to explain it to you and recommend to you that you are entitled to an attorney post-sentencing for purposes of an appeal. And if you cannot afford an attorney one will be provided to you. . . .

> "But if you are asking me to rule on that motion, in reading between the lines, as I often have to do with your motions Mr. Hatcher, if there is a request for a continuance of sentencing, that is denied. [¶] And I would also remind you, Mr. Hatcher, that you . . . refused to waive time for purposes of sentencing on today's date. And I believe this is the statutorily end date."

Hatcher confirmed he "didn't waive time." He then complained that the probation officer was from the central division instead of the northern division; that the probation officer interviewed Hatcher about his mental health history but did not interview Hatcher's psychotherapists; and that the psychotherapists would have explained to probation and the court that Hatcher's "bipolar . . . status was the cause of this."

The court responded that it was going to proceed with sentencing, that Hatcher would have the opportunity to raise these issues on appeal, and that

---

[5] The appellate record does not include any exhibits to this motion.

13

he would be entitled to appointed appellate counsel.  As noted, the court imposed the upper term of five years.

## B.  *Legal Principles*

" ' "Both the due process clause of the Fourteenth Amendment . . . and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent.  [Citations.]" ' " (*People v. Mai* (2013) 57 Cal.4th 986, 1032; see § 1367, subd. (a); *People v. Rodas* (2018) 6 Cal.5th 219, 230.)  "A defendant is incompetent to stand trial when he or she lacks the ability to consult with defense counsel with a reasonable degree of rational understanding or a rational and factual understanding of the proceedings." (*People v. Johnson* (2018) 6 Cal.5th 541, 575 (*Johnson*); see § 1367, subd. (a).)

"A trial judge must suspend proceedings and hold a hearing 'whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial.' " (*Johnson, supra*, 6 Cal.5th at p. 575; see § 1368, subd. (a).)[6]  Short of expert testimony establishing "with

_____

[6]    Section 1368 states in part:  "(a)  If, during the pendency of an action and prior to judgment . . . a doubt arises in the mind of the judge as to the mental competence of the defendant, he or she shall state that doubt in the record and inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent.  If the defendant is not represented by counsel, the court shall appoint counsel.  At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time.  [¶]  (b) If counsel informs the court that he or she believes the defendant is or may be mentally incompetent, the court shall order that the question of the defendant's mental competence is to be determined in a hearing . . . .  If counsel informs the court that he or she believes the defendant is mentally competent, the court may

particularity" the defendant's incompetence, "no single factor is necessary to establish sufficient doubt of a defendant's competence as to require a hearing. Rather, a court must consider the 'aggregate of th[e] indicia' of the defendant's competence. [Citation.] 'Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. [Citations.]' [Citation.]" (*People v. Ghobrial* (2018) 5 Cal.5th 250, 270 (*Ghobrial*).) " '[M]ore is required to raise a doubt than mere bizarre actions [citation] or bizarre statements [citation] or statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation].' " (*Ibid*.) "[E]vidence of mental illness alone is not sufficient to raise a doubt about a defendant's competence to stand trial. The question is whether [the] defendant's mental illness interfered with his ability to understand the nature and purpose of the criminal proceedings or to communicate with his counsel about his defense. [Citations.]" (*Id*. at p. 271.)

"On appeal, our task is to examine 'the inferences that were to be drawn from the undisputed evidence' and to ask 'whether, in light of what was then known, the failure to make further inquiry into [the defendant]'s competence to stand trial, denied him a fair trial.' [Citation.]" (*Ghobrial*, *supra*, 5 Cal.5th at pp. 269-270.) " ' "[A]bsent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a

---

nevertheless order a hearing. . . . [¶] (c) Except as provided in Section 1368.1, when an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined."

competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial." ' [Citation.] 'Whether to order a present sanity hearing is for the discretion of the trial judge, and only where a doubt as to sanity may be said to appear as a matter of law or where there is an abuse of discretion may the trial judge's determination be disturbed on appeal.' " (*Id.* at p. 269.)

## C. *Analysis*

This is a close case. Judge Brown's post-verdict observation that he had "some real doubts about [Hatcher's] mental competence" certainly warrants scrutiny. But, ultimately, although it is clear from the record that Hatcher suffers *to some extent* from mental health issues, substantial evidence does not establish *as a matter of law* that those issues "interfered with his ability to understand the nature and purpose of the criminal proceedings . . . ." (*Ghobrial*, *supra*, 5 Cal.5th at p. 271.)

To the contrary, substantial evidence in the appellate record shows that Hatcher, indeed, understood the nature and purpose of the criminal proceedings. In connection with the preliminary hearing, he sought to subpoena defense witnesses, cross-examined all prosecution witnesses, and testified in his own defense as to a coherent legal theory. He subsequently managed to get his bail reduced from $100,000 to $50,000, and sought a further reduction.

Hatcher engaged in extensive pretrial motion practice that demonstrated his understanding of material evidence (the thrift store voucher/receipt theory), impeachment, and procedural concerns regarding photo lineups. His plea negotiations at the readiness conference further demonstrate his appreciation for the nature of the proceedings and potential outcomes.

16

At his first trial, Hatcher filed motions in limine directed at pertinent evidentiary and procedural issues, gave an opening statement, and cross-examined all prosecution witnesses. And despite presenting no defense evidence, Hatcher managed to obtain a hung jury, which he maintained by refusing to consent to removal of the lone holdout juror.

At his second trial, Hatcher filed pertinent motions in limine, sought to exclude his prior convictions as impeachment evidence, participated in voir dire, gave an opening statement, cross-examined all prosecution witnesses, testified in his own defense, participated in the jury instruction conference, and gave a closing argument.

All of this evidence affirmatively demonstrates Hatcher understood the nature and purpose of the proceedings. Thus, we are not surprised that none of the several judges before whom Hatcher appeared over the course of about six months felt compelled to hold a competency hearing. Indeed, after the preliminary hearing, Judge Washington expressly stated he did not "find anything about [Hatcher's] mental condition . . . that suggest[ed] . . . [Hatcher was] incapable of representing [him]self."

This is not to say that Hatcher's understanding of the proceedings translated into legal acumen—it did not. For example, although he identified many relevant witnesses and sought to subpoena them for trial, he repeatedly failed to properly serve the subpoenas. He also filed numerous unsuccessful or inapplicable motions. But Hatcher's lack of legal acumen did not compel the court to hold a competency hearing.

Contrary to his suggestion, Hatcher's posttrial motion seeking appointment of counsel "because of [his] mental state *at the time*" (italics added) was not tantamount to a request to evaluate his *present* mental competence. The most reasonable reading of the quoted phrase is that

17

Hatcher intended to use his mental state *at the time of the offense* as a basis to somehow lessen his culpability. This construction is borne out by the fact Hatcher attempted to testify during the second trial that his bipolar disorder caused him to get angry at Sonia when they had a misunderstanding about the vouchers. He gave similar explanations at the bail review hearing and to the probation officer.[7] Given this context, Hatcher's request did not obligate the trial court to appoint counsel or investigate Hatcher's present mental competence.

Nor did Hatcher's pretrial references to psychotherapists amount to a request for a competency hearing or otherwise signal to the court that Hatcher presently lacked mental competence. First, as with his posttrial motion, it appears Hatcher sought to introduce evidence of his mental state *at the time of the offense* as some sort of defense, and not as a basis to establish he was not competent to stand trial. Second, in this vein, Judge Washington admonished Hatcher at the preliminary hearing that the very fact that Hatcher was self-aware enough to seek evidence substantiating he suffered from a mental condition could undermine a potential claim that he lacked mental competence. Third, even if Hatcher had introduced expert testimony establishing he suffered from bipolar disorder at the time of the offense—or even at the time of trial—such testimony would not have compelled the court to appoint counsel or conduct a competency hearing absent additional testimony establishing with particularity that the disorder

---

7      As noted, Hatcher told the court at the bail review hearing that his "psychiatrist [in Chicago] could explain" that Hatcher "got upset and just stormed out" of the thrift store "because [he] wasn't taking [his] medication" for bipolar disorder. Hatcher gave no indication his psychiatrist would testify that Hatcher's bipolar disorder would preclude him from representing himself.

prevented Hatcher from understanding the nature of the proceedings. (See *Ghobrial*, *supra*, 5 Cal.5th at p. 271 ["[E]vidence of mental illness alone is not sufficient to raise a doubt about a defendant's competence to stand trial."]; *Johnson*, *supra*, 6 Cal.5th at pp. 552, 578 [expert testimony that the "defendant suffered some from psychosis with 'some kind of a thinking disorder' " did not obligate the trial court to conduct a competency hearing].) Nothing in the record suggests an expert would have so testified.

Hatcher asserts his attempt to subpoena Michelle Obama was a red flag regarding his mental competence. While this attempted discovery was admittedly bizarre, " 'more is required to raise a doubt than mere bizarre actions [citation] . . . .' " (*Ghobrial*, *supra*, 5 Cal.5th at p. 270.)

Hatcher cites several statements by the trial court that he contends indicate the court harbored sufficient doubt as to his mental competence that the court was obligated to appoint counsel and conduct a competency hearing. We are not persuaded.

In one example, the court told Hatcher at sentencing that his "motions are for the most part gibberish." It is clear from our review of the record that this was hyperbole. The fact that some of Hatcher's motions may have been poorly written, or ultimately proved unsuccessful, did not compel the court to conduct a competency hearing.

In another cited example, the court told Hatcher, "[Y]ou're not perceiving things accurately. I mean, what you're saying just did not happen *or what this impeachment would be*."[8] (Italics added.) In context, however, the court was merely disagreeing with Hatcher that Sonia's trial testimony was subject to impeachment for being inconsistent with a statement in a

---

[8] Hatcher omitted the italicized portion of this quote from his brief.

police report about whether she had started ringing-up Hatcher's merchandise before the incident. Reasonable minds often disagree about whether different statements are truly inconsistent.

Hatcher repeatedly cites an instance in which the trial court told him he was "not competent." But context indicates the court was clearly referring to Hatcher's legal acumen, not his mental competence.[9] Hatcher's ill-advised decision to represent himself did not, without more, establish his lack of mental competence.

This brings us to the trial court's superficially problematic statement: "I have some real doubts about your mental competence." At first blush and in isolation, this statement gives us pause. But we are satisfied that, in context, the trial court did not harbor sufficient doubt as to obligate it to appoint counsel for Hatcher or to hold a competency hearing.[10]

Most significantly, the fact the court expressly cited section 1368—the statute that governs mental competency proceedings—indicates the court had the relevant legal framework in mind. Moreover, the court's observation that

---

[9]    Specifically, in trying to convince Hatcher to allow counsel to represent him on appeal, the trial court stated: "[T]here may very well be appellate issues in the trial that a competent and experienced appellate attorney would be able to identify. Honestly, sir, *you are not competent.* And as I indicated earlier my opinion is *you did not represent yourself competently* during both trials." (Italics added.)

[10]    For context, we repeat the entire relevant passage: "Probation will allow you to get some help, both medically and psychologically, because to be quite blunt, Mr. Hatcher, I think you have difficulty. And why—and maybe you were. I don't know if you ever went through a Penal Code [section] 1368 examination, but I have—and I'll say this on the record and will continue to say it. *I have some real doubts about your mental competence.* But you got to this point, and the Court repeatedly allowed you to defend yourself. . . ." (Italics added.)

Hatcher "got to this point" and that the court had allowed him to continue representing himself strongly suggests the court believed Hatcher understood the nature and purpose of the proceedings. In light of the trial court's extensive firsthand observation of Hatcher throughout two jury trials, we will not second-guess the trial court's implicit determination that Hatcher's mental health condition was not severe enough to trigger competency proceedings. (See *Ghobrial, supra,* 5 Cal.5th at p. 269 [" ' "the trial judge's decision not to order a competency hearing is entitled to great deference . . . because the trial court is in the best position to observe the defendant during trial" ' "].)

In sum, although the issue is close, we conclude the trial court did not err by not appointing Hatcher counsel or conducting a competency hearing.

## II. *Request for Counsel*

In a related challenge, Hatcher contends the trial court denied him his Sixth Amendment right to counsel by (1) denying his "motion for continuance, to hire a[n] attorney, for a new hearing, and jury trial" (capitalization omitted); and (2) failing to inquire about his competence before allowing him to continue to represent himself. We disagree in both respects.

### A. *Background*[11]

After the court pronounced sentence and explained Hatcher's appellate rights, Hatcher stated he wanted to file his notice of appeal "right now." The court repeatedly recommended that Hatcher refrain from doing so until after appellate counsel had been appointed. But Hatcher insisted on filing his

---

[11] We have already set forth the background regarding Hatcher's motion in Discussion part I.A.7., *ante,* which we incorporate here in full. Accordingly, we set forth here only the additional pertinent factual background.

21

notice immediately, stating, "When I get an attorney then they will proceed forward.  But as of today I am . . . attorney of record . . . [and] I would like to file my notice of appeal."

When the court again encouraged Hatcher to wait to allow appellate counsel to prepare the notice of appeal, Hatcher insisted on doing it himself, stating, "Well, your Honor, I am representing myself in the trial."

The court allowed Hatcher to file the notice of appeal.  The court again encouraged Hatcher to allow counsel to represent him on appeal, observing the court was "fairly [confident]" Hatcher "would not be facing five years in state prison" if he had not insisted on representing himself throughout trial.

## B.  *Legal Principles*

"A request to revoke in propria persona status and have an attorney appointed is committed to the sound discretion of the trial court.  [Citation.] However, such a request must be unequivocal, just as a request to waive counsel must be unequivocal." (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1061 (*Weber*); see *People v. Lawrence* (2009) 46 Cal.4th 186, 192 (*Lawrence*).)

When "a self-represented defendant . . . , after commencement of the trial, seeks to relinquish responsibility for his own defense and obtain the appointment of counsel to represent him for the remainder of the trial," a trial court "must consider the totality of the circumstances in exercising its discretion." (*People v. Lawley* (2002) 27 Cal.4th 102, 149.)  "[A] trial court should consider, along with any other relevant circumstances, '(1) [the] defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of [the] defendant's

22

effectiveness in defending against the charges if required to continue to act as his own attorney.' " (*Lawrence, supra*, 46 Cal.4th at p. 192.) However, " ' "[w]hile the consideration of these criteria . . . is obviously relevant and helpful to a trial court in resolving the issue, they are not absolutes, and in the final analysis it is the totality of the facts and circumstances which the trial court must consider in exercising its discretion as to whether or not to permit a defendant to again change his mind regarding representation . . . ." ' " (*Ibid.*)

"To establish an abuse of discretion, [a defendant] must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . . ." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

## C. *Analysis*

We conclude the trial court did not err by denying Hatcher's motion or by not inquiring about his mental competence.

Hatcher's challenge to the court's ruling on his motion fails for two reasons. First, the motion was not an unequivocal request to have counsel appointed, as required. (*Weber, supra*, 217 Cal.App.4th at p. 1061.) Instead, the trial court stated it was construing the motion as one for a continuance. This was a reasonable construction because (1) Hatcher did not object to it; (2) the reasons he articulated for seeking counsel were unrelated to sentencing (the issue then before the court); and (3) when the court encouraged Hatcher to allow counsel to represent him on appeal, he

23

confirmed he was still representing himself at the sentencing hearing.  Thus, the trial court did not err in construing the nature of Hatcher's motion.

Second, even were we to construe Hatcher's motion as a request for the immediate appointment of counsel, we would find no abuse of discretion in the trial court's denial of the motion.  The trial court observed that Hatcher had refused to waive time for sentencing, which Hatcher confirmed, and the hearing was set for the last statutorily permissible day.  Moreover, in light of Hatcher's history of dilatory tactics throughout both trials—about which the trial court had repeatedly admonished Hatcher—the trial court could reasonably have construed the last-minute request to appoint counsel as nothing more than a further attempt to delay proceedings.

Hatcher argues the trial court should have granted his motion because he did a poor job of representing himself at trial.  But a defendant's legal acumen is only one of several factors trial courts may consider when ruling on a request to revoke self-representation.  (*Lawrence*, *supra*, 46 Cal.4th at p. 192.)

Turning to Hatcher's claim that the court's failure to inquire as to his mental competence deprived him of his right to counsel, we conclude the challenge fails primarily for the reasons discussed in part I, *ante*.  In addition, although the trial court commented critically on Hatcher's legal skills and suspected they resulted in a less favorable outcome than counsel would have obtained, "[t]he fact a defendant does a bad job, or even fails to contest the case, is not a basis to revoke self-representation."  (*Weber*, *supra*, 217 Cal.App.4th at p. 1060; see *People v. Mickel* (2016) 2 Cal.5th 181, 193, 208 [revocation of self-representation was not triggered even where a psychotherapist opined the defendant's competence was " 'highly questionable because of his irrational thinking,' " the defendant presented a

24

legally nonviable defense, and then reacted emotionally to the court's rejection of the defense]; *People v. Best* (2020) 49 Cal.App.5th 747, 757-758 [the defendant was entitled to represent herself even though she misunderstood concepts regarding speedy trial rights, statutes pertinent to her offenses, posttrial motions, general versus specific intent crimes, and questions from the court regarding her right not to testify at trial].)

### III. *Mental Health Diversion*

Hatcher requests that we remand this matter for the trial court to consider whether to grant him pretrial mental health diversion under section 1001.36. The Attorney General maintains Hatcher forfeited this issue by failing to raise it in the trial court. We agree with the Attorney General. Moreover, we conclude remand would be futile in light of the trial court's comments before and during sentencing.

Effective June 2018, the Legislature enacted sections 1001.35 and 1001.36, which give trial courts the discretion to grant pretrial mental health diversion to defendants with qualifying mental disorders. (Stats. 2018, ch. 34, § 24; see *People v. Frahs* (2020) 9 Cal.5th 618, 624, 626-627 (*Frahs*).) "As originally enacted, section 1001.36 provided that a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety if treated in the community. [Citations.]"[12] (*Frahs*, at pp.

---

[12] "Section 1001.36 was subsequently amended . . . to specify that defendants charged with certain crimes, such as murder and rape, are

626-627.) If a defendant successfully completes pretrial diversion, the trial court must dismiss the pending charges, and the underlying arrest "shall be deemed never to have occurred" for most purposes. (§ 1001.36, subd. (e).)

The complaint against Hatcher was filed in late October 2018, about two months after the mental health diversion statute took effect. He made his first appearance in late January 2019, about seven months after the statute took effect. Thus, the statute was in effect the entire time Hatcher's case was pending below. By failing to invoke the statute in the trial court, Hatcher has forfeited the issue on appeal. (See *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 [failure to seek dismissal pursuant to section 1385 forfeits right to raise issue for first time on appeal]; *People v. Scott* (1994) 9 Cal.4th 331, 353 [failure to object to discretionary sentencing choices forfeits challenges on appeal]; *People v. Trujillo* (2015) 60 Cal.4th 850, 856 [holding forfeiture rule applies in context of challenges to a fee order; forfeiture results from the failure to assert a right in the tribunal having jurisdiction to determine it].) It is of no moment that Hatcher was representing himself because "[s]elf-represented defendants are 'held to the same standard of knowledge of law and procedure as is an attorney.'" (*People v. Frederickson* (2020) 8 Cal.5th 963, 1000; accord *People v. Kiney* (2007) 151 Cal.App.4th 807, 815 ["a pro se defendant is held to the same standard as an attorney"].)

Even if Hatcher had not forfeited the issue, we would find it unnecessary to remand for further consideration because the trial court's comments before and during sentencing indicate a remand would be futile. (See, e.g., *People v. Fuhrman* (1997) 16 Cal.4th 930, 944 ["remand is not required where the trial court's comments indicate that even if it had

ineligible for diversion." (*Frahs, supra*, 9 Cal.5th at pp. 626-627.) This amendment is not at issue here.

authority to strike a prior felony conviction allegation, it would decline to do so"]; *People v. McVey* (2018) 24 Cal.App.5th 405, 418.)

After the jury returned its guilty verdict, the trial court admonished Hatcher that the current offense and the prior offense at the hardware store "show[] that if you were left out on the streets that you would be a danger to public safety." This negates the prerequisite that a court grant pretrial diversion only if the court is "satisfied that the defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (b)(1)(F).)

Additionally, although the trial court initially seemed somewhat amenable to fashioning a sentence that would enable Hatcher to receive services for his mental health issues, once the court learned from the probation report of Hatcher's "shock[ingly]" extensive criminal history—which was "accelerating" in violence—the court denied probation and imposed the upper term of five years.

On this record, we are confident the trial court would not grant Hatcher pretrial mental health diversion were we to remand for consideration of the issue.

### IV. *Preventing Presentation of Evidence*

As already discussed in part I.A.2., *ante*, before the preliminary hearing Hatcher filed a purported "motion to dismiss" that really "seem[ed] to be . . . a request to subpoena" two psychotherapists to testify at the preliminary hearing. The trial court explained it was unable to take action on the motion because service of subpoenas was a matter for Hatcher to address with OAC. The court also cautioned Hatcher that the very fact that he was self-aware enough to seek evidence substantiating he suffered from a mental health condition could undermine a potential defense or claim that he lacked mental

27

competence. Hatcher contends these actions by the trial court violated his "right to present witnesses and evidence in his defense." The contention is without merit.

As to Hatcher's motion, the trial court merely explained at the preliminary hearing that it could not take action because filing subpoenas with the court does not effectuate service on the subpoenaed party. The court advised Hatcher to coordinate with OAC in the future when he needed to serve subpoenas. This was not tantamount to *preventing* Hatcher from introducing testimony by psychotherapists. Indeed, although the court told Hatcher it would not compel his psychiatrist *in Chicago* to appear in San Diego, the court expressly left open the possibility of appointing a psychotherapist if Hatcher "establish[ed] a basis" and coordinated with OAC and the supervising judge.

Nor did the trial court violate Hatcher's rights by explaining that his attempt to subpoena psychotherapists may be "self-defeating" as to potential defenses based on his mental condition. The court merely offered its candid assessment of the potential impact of Hatcher's doing so. Nothing in the record indicates the court unduly influenced Hatcher.

DISPOSITION

Affirmed.

HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.

28